UNITED STATES of America,
Plaintiff–Appellee,

v.

Horace Marion SWANN, III,
Defendant–Appellant.

No. 97–4462.

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1998.

Decided July 14, 1998.

**ARGUED:** Mark Robert Wagner, Assistant Federal Public Defender, Office of the Federal Public Defender, Baltimore, Maryland, for Appellant. Jane Frances Nathan, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF**: James K. Bredar, Federal Public Defender, Office of the Federal Public Defender, Baltimore, Maryland, for Appellant.

Lynne A. Battaglia, United States Attorney, Greenbelt, Maryland, for Appellee.

Before MURNAGHAN, WILKINS, and HAMILTON, Circuit Judges.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge WILKINS and Judge HAMILTON joined.

## OPINION

MURNAGHAN, Circuit Judge:

In investigating a quite recent theft, a police officer stopped and frisked two suspects. In the sock of one, Horace Swann, III, the officer felt something hard and unusual. He did not testify that he believed it to be a weapon or that he knew it was not a weapon; rather he stated only that he did not know what it was. The officer removed the unusual object from Swann's sock and it turned out to be a group of credit cards which had been stolen in the theft.

Swann claimed that the seizure of the credit cards out of his sock exceeded the permissible bounds of a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). His motion to suppress was denied by a magistrate judge and by the district judge on appeal, and he has now appealed to the Fourth Circuit.

Although the searching officer did not testify that he believed the item in Swann's sock to be a weapon when he removed it, a reasonable officer in his circumstances could well have believed that the item was a weapon (specifically, a box cutter with a sharp blade), and therefore the seizure did not exceed the permissible bounds of a *Terry* stop. That determination renders it unnecessary and unproductive for us to address the district court's alternative holding that the credit card discovery was inevitable.

### I.

On February 24, 1994, at about 5:50 p.m., two police officers responded to reports of a theft of a wallet in an office building. Officer Martin questioned two witnesses while Officer Fitzgerald chased a female suspect who was fleeing the scene as the officers arrived.

According to the witnesses, the female suspect was noticed leaving the work area of the theft victim carrying the victim's wallet. She had been detained by the witnesses, but had tossed the wallet in the direction of three black males standing near the elevator. One of the men retrieved the wallet from where it had fallen and all three fled the scene together.

Officer Martin was getting a description of the clothing worn by the suspects when the elevator opened and a black male stepped off. A witness immediately identified him as one of the men involved in the theft. Upon being questioned, the suspect indicated that he was looking for a friend named "Darlene Walker." Officer Martin took the male suspect to the nearby police station and while there heard over the police radio that Officer Fitzgerald had apprehended the female suspect. Officer Fitzgerald confirmed her identity as Darlene Walker.

Officer Martin returned to the location of the crime to question Darlene Walker. Walker stated she had been in the building with her cousin, who was wearing a black leather jacket. The male suspect that had been found getting off the elevator was *not*

wearing such a jacket. As a result of the information provided by Walker and the witnesses, Officer Martin set out to look throughout the building for two more black male suspects, one of whom was wearing a black leather jacket.

During this investigation, Officer Martin rode the elevator down to the parking garage. When the elevator doors opened he was faced with two black males, one of whom was wearing a black leather jacket. The man without the jacket was the defendant, Swann. Officer Martin testified that the two men seemed "really nervous and uneasy and kind of edgy; didn't want to hang around." He also testified that when he told them he needed to speak to them, one of them (not Swann) tried to circle around him to get behind his back. Officer Martin felt threatened by this action; he ordered the man to move in front of him and called for back-up.

When Officer Fitzgerald arrived on the scene the officers conducted a pat-down frisk for weapons. In patting down Swann, Officer Martin felt a hard object in his left sock. Martin testified that it was "kind of abnormal, and it felt kind of hard." He did *not* testify, however, that he thought the object was a weapon, but only claimed that he did not know what it was.

Officer Martin retrieved that hard object from the sock of Swann; it turned out to be a stack of five credit cards belonging to the victim of the theft. The two suspects were placed under arrest. A full search incident to the arrest was conducted and a film canister with small plastic baggies containing crack cocaine was found in Swann's pants pocket.

Swann was eventually charged in a three count Criminal Information with conspiracy to steal the property of another, unlawfully receiving and concealing the property of another, and possession of a controlled substance, *i.e.*, crack cocaine. He consented to be tried before a magistrate judge. Swann moved for suppression of the credit cards and cocaine seized from him, but by order of October 4, 1996, the magistrate judge denied the Motion to Suppress.

On October 9, 1996, Swann appeared before another magistrate judge and entered a conditional guilty plea to 18 U.S.C. § 662, possession of stolen property. Pursuant to Fed.R.Crim.P. 11, Swann reserved the right to appeal the denial of his Motion to Suppress. The remaining charges were dismissed as part of the plea agreement. Swann was sentenced to 65 days in the Bureau of Prisons with credit for time served, one year supervised release, a fine of $150.00 and a special assessment of $10.00.

Swann noted an appeal to the United States District Court for the District of Maryland. The district court affirmed the decision of the magistrate court judge not to suppress the evidence, relying both on the ground that the evidence would inevitably have been discovered because the two suspects would have been positively identified by the witnesses, arrested and searched incident to that arrest, as well as on the alternate ground that the searching officer reasonably believed the object in the sock could be a weapon. Swann appeals to us.

## II.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court approved the practice of a police officer's investigatory stop-and-frisk:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. 1868. Swann has argued that the credit cards found in his sock (and the crack cocaine found in the search incident to Swann's arrest) should have been sup-

pressed because Officer Martin exceeded the permissible bounds of a *Terry* stop-and-frisk. In determining whether Officer Martin's actions were justified, "our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20, 88 S.Ct. 1868.

### A. The Terry *Stop was Justified at its Inception*

■ Preliminarily, Swann asserts that the district court should have suppressed the fruits of Officer Martin's search because the facts surrounding the encounter were "arguably insufficient to establish an articulable suspicion that would justify the seizure of Mr. Swann." To "stop and briefly detain a person for investigative purposes," an officer need only have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States. v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Where the officer "has reason to believe that he is dealing with an armed and dangerous individual," he may conduct a reasonable frisk of the outer clothing for weapons. *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. Because a frisk, although a "severe ... intrusion upon cherished personal security," *id.* at 24–25, 88 S.Ct. 1868, is substantially less intrusive than a full-blown search, and because of "the paramount interest in officer safety and the extraordinary risks to which law enforcement officials are exposed during [investigatory] detentions," *United States v. Stanfield,* 109 F.3d 976, 979–80 (4th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997), the standard justifying a frisk is not onerous. Whether an officer has such reasonable suspicion to justify a stop-and-frisk is subject to *de novo* review. *See United States v. Perrin,* 45 F.3d 869, 871 (4th Cir.1995).

■ We think it clear beyond peradventure that Officer Martin possessed the requisite reasonable suspicion to support the stop-and-frisk of Swann and his companion. Officer Martin, investigating a crime that had just occurred, saw two suspects fitting the descriptions of those wanted for the crime.

The suspects behaved nervously and in a threatening manner upon being approached and addressed. It was the officer's duty to require that the two men stop to answer a few questions, and it was manifestly reasonable to frisk them for weapons to ensure his own safety. *Cf. United States v. Baker,* 78 F.3d 135, 137 (4th Cir.1996) ("Based on the inordinate risk of danger to law enforcement officers during traffic stops, observing a bulge that could be made by a weapon in a suspect's clothing reasonably warrants a belief that the suspect is potentially dangerous, even if the suspect was stopped only for a minor violation."). Therefore, the *Terry* stop-and-frisk was appropriate.

### B. *The Removal of the Hard Item in Swann's Sock was Within the Legitimate Scope of the* Terry *Frisk*

■ Swann's main contention is that because the officer who seized the credit cards did not himself believe the item in the sock to be a weapon, the seizure exceeded the permissible scope of a *Terry* frisk. Because "[t]he sole justification of the search in [such a] situation is the protection of the police officer and others nearby," the frisk "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry,* 392 U.S. at 29, 88 S.Ct. 1868. An officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk. *See Minnesota v. Dickerson,* 508 U.S. 366, 378, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *Sibron v. New York,* 392 U.S. 40, 65–66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

■ We begin the evaluation of the scope of the search by asking whether Officer Martin used the *Terry* frisk as an excuse to search for evidence, by continuing to search after having concluded that Swann was unarmed. Once an officer has patted down a suspect for weapons and determined that he is not armed, that officer exceeds the permissible scope of a *Terry* frisk if he continues to search the suspect. *See Dickerson,*

508 U.S. at 378–79, 113 S.Ct. 2130.[1] An officer's "squeezing, sliding and otherwise manipulating the contents of [a] defendant's pocket," if the officer knows the pocket contains no weapon, is prohibited. *Id.* at 378, 113 S.Ct. 2130. Swann contends that Officer Martin violated this rule by removing the hard item he found in Swann's sock, despite the asserted fact that Officer Martin "did not suspect that the item was a weapon."

 The only evidence regarding Officer Martin's subjective belief comes from two colloquies, one on direct examination and one on cross-examination. The direct examination went as follows:

Q. What, if anything, did you find on Mr. Swann?

A. Okay. As I patted down, I got down to, I believe, his left sock, and I felt an object in his left sock. I thought that was kind of abnormal, and it felt kind of hard.

Q. What did it feel like? Can you describe it?

A. I couldn't tell you what it was, because it just, you know—

Q. Not what it was. Could you tell us what it felt like?

A. It felt like a hard object.

Q. Could you identify it at that point?

A. No.

The testimony on cross-examination was:

Q. Okay. Now, when you were patting him down, it did not feel like any kind of weapon that you knew of, did it?

A. I didn't know what it was at the time.

Although Swann perhaps exaggerates when he asserts that the officer "did not suspect that the item was a weapon," it is true that there is no evidence in the record suggesting that the officer *did* suspect the item to be a weapon. Rather, the evidence is entirely ambiguous whether Martin suspected or did not suspect a weapon. The purpose of a frisk is to allow an officer "to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry,* 392 U.S. at 23, 88 S.Ct. 1868. Because Officer Martin did not know what the hard object in Swann's sock was, he was not assured that it was not a weapon, and he removed it to find out. *Dickerson's* rule, that a frisk violates the Fourth Amendment if it continues after the officer has determined that the suspect is unarmed, is therefore not implicated.

Nevertheless our inquiry must go further. Having detected the presence of an unknown, potentially dangerous object on a suspect during a frisk, the test for whether an officer may search farther and seize the item is an objective one. Officer Martin need not himself "have been absolutely certain that the individual [was] armed; the [only question] is whether a reasonably prudent man in the circumstances would [have been] warranted in the belief that his safety or that of others was in danger." *Stanfield,* 109 F.3d at 986 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868) (alteration in original). That is, would a reasonable officer in those circumstances have believed that the item could likely be a weapon?

In various contexts, the Fourth Circuit has stressed that the Fourth Amendment's reasonableness standard is an objective one. In *United States v. Hassan El,* 5 F.3d 726 (4th Cir.1993), we adopted a "purely objective" standard for evaluating whether an officer's allegedly pretextual traffic stop comported with the Fourth Amendment, *id.* at 730. Such a standard "relies solely on the objective facts and circumstances surrounding the stop," and disregards the subjective motivations of the officer. *Id.* In *Martin v. Gentile,* 849 F.2d 863 (4th Cir.1988), we stated:

---

1. The Supreme Court has additionally held that: If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.
*Dickerson* 508 U.S. at 375–76, 113 S.Ct. 2130. The "plain feel doctrine" of *Dickerson* is inapposite in this case because the credit cards' identity was not immediately apparent.

The standard of "reasonableness" under the fourth amendment is wholly objective; the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his own subjective intent or motivation. Subjectively bad intentions on the part of the individual officer will not make a constitutional violation out of an otherwise reasonable seizure; nor will subjectively good intentions render an objectively unreasonable seizure constitutional.

*Id.* at 869 (citations omitted).

The Supreme Court has consistently evaluated officers' actions by an objective standard. In *Terry v. Ohio,* itself, the Supreme Court stressed that "it is imperative that the facts be judged against an objective standard." 392 U.S. at 21–22, 88 S.Ct. 1868. More recently the court reaffirmed that "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent" of the acting officers. *Whren v. United States,* 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). It should by now be perfectly clear that "[w]hether a Fourth Amendment violation has occurred 'turns on an objective assessment of [Officer Martin's] actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)) (citation omitted); *see also, e.g., Scott,* 436 U.S. at 138, 98 S.Ct. 1717 ("We have since held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."). Application of an objective standard is important because in administering the guarantees of the Fourth Amendment through the exclusionary rule, we establish the boundaries of security and privacy that individuals may rely upon in all cases, regardless of the subjective beliefs of any one particular officer.

In Swann's case, the seizure was proper because, even though Officer Martin may not actually have decided that the item was a weapon, a reasonable officer in his circumstances could justifiably have believed that item was a weapon.[2] Officer Martin was confronted with two nervous and edgy men who matched the descriptions of the thieves for whom he was looking. Upon being addressed by the officer, one of the men circled around him in a potentially threatening manner. After calling for backup, Officer Martin frisked the men and felt a hard rectangular object in Swann's sock. As the magistrate judge observed, the object in Swann's sock was approximately the same size and shape as a box cutter with a sharp blade, which is often used as a weapon.

The location of the object in the sock, as well as its hard character and its shape, made it suspicious. A similarly shaped hard object in Swann's pocket certainly would have raised no alarms, as there could be innumerable innocent explanations for it. And a hard rectangular object in one's sock might not be suspicious on a jogger or someone similarly dressed. But these men were both fully dressed, and Swann's pants had pockets that could have contained an item of that size and shape.

Given all the circumstances, it was objectively reasonable for the officer to believe that this particular hard object could likely be a weapon and to seize the item to satisfy himself that it was not something that could be used to inflict harm. Officers making

---

**2.** The most analogous decision in our Circuit is an unpublished one, and is therefore not binding precedent: In *United States v. Goodman,* 14 F.3d 597, No. 93–5208, 1993 WL 533205 (4th Cir. Dec. 27, 1993) (unpublished), this court held that an officer was justified in reaching into a suspect's pockets to determine whether the lumps he felt in them were weapons. Applying an objective analysis, we concluded that even though the police officer "did not testify specifically that he believed [bulges in the suspect's clothing] could be weapons when he first felt them, ... such a belief would have been eminently reasonable under the circumstances given the size, shape, and rigidity of the objects in question and [the suspect's] furtive behavior." *Id.* at **7.

*Terry* stops must make "quick decision[s] as to how to protect [themselves] and others from possible danger." *Terry,* 392 U.S. at 28, 88 S.Ct. 1868; *accord Stanfield,* 109 F.3d at 983. Were we to disapprove of Officer Martin's actions, we would require an officer to allow a suspicious object to remain within easy reach of demonstrably nervous and potentially aggressive suspects. Our respect for the privacy rights of citizens does not require such an increase in the danger that police officers must face. The removal of the object from Swann's sock was properly within the scope of the *Terry* stop-and-frisk.

Although the district court focused on the subjective beliefs of Officer Martin, we may affirm the district court's judgment for any reason supported by the record, even if it is not the basis that the district court used. *See Cochran v. Morris,* 73 F.3d 1310, 1315 (4th Cir.1996) *(en banc ).* Having reached the conclusion that the seizure of the item from Swann's sock was proper, we do not resolve whether the inevitable discovery doctrine should be so extended as to lead to the same result, a holding about which we have grave doubts.

The judgment of the district judge accordingly is

*AFFIRMED.*