UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

v.                                              No. 01-4946

ROBERT E. HAINES,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CR-01-256)

Argued: May 9, 2002

Decided: July 11, 2002

Before WILKINSON, Chief Judge, and WILLIAMS and
KING, Circuit Judges.

---

Reversed and remanded by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Stephen Wiley Miller, Assistant United States Attorney,
Richmond, Virginia, for Appellant. Amy Leigh Austin, OFFICE OF
THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for
Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney,
Michael T. Hosang, Special Assistant United States Attorney, Rich-
mond, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

After Robert E. Haines was charged in the Eastern District of Virginia with the illegal possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), the district court suppressed his inculpatory statements on the ground that they were obtained in violation of the Constitution. *United States v. Haines*, 3:01 CR256, Memorandum Opinion and Order (E.D. Va. Nov. 29, 2001) (the "Suppression Order"). The Government has taken an interlocutory appeal of the Suppression Order, pursuant to 18 U.S.C. § 3731. As explained below, we reverse and remand.

I.

On November 28, 2001, the district court conducted an evidentiary hearing in respect to Haines's motion to suppress his statements and the firearm underlying his indictment. Our recitation of the factual underpinnings of this appeal, set forth below, is drawn from the evidence presented in this hearing and from the findings made in the Suppression Order.

On July 12, 2001, the Richmond Police Department was involved in the conduct of a surveillance operation in the 1300 block of North 27th Street. The surveillance was initiated because of recent drug and homicide activity in that area of Richmond, but it was not directed at any particular individual. Between 8:30 and 9:00 a.m., in the area where the surveillance was ongoing, Officer William Breedlove noticed Haines "walk around a parked van, look up and down the street several times, and then motion to an individual who came out of a house carrying a rifle with a scope." Suppression Order at 1. Haines and the man with the rifle then entered the van and drove away. Breedlove observed the license plate of the vehicle and, as the district court found, he was "aware of a possible connection between

the van and a homicide." *Id.* Breedlove then radioed to other Richmond police officers a full description of the van, the individuals, the firearm, and the preceding events.

Two nearby officers, Robert S. Sprinkle and Eric Flick, heard the radio broadcast and attempted to locate the van. After initially spotting the van, Sprinkle and Flick briefly lost sight of it before finding it again, parked in an alley at 30th and S Streets. Upon entering the alley, Sprinkle and Flick observed three men near the van, two standing by the driver's side door and the other, Haines, exiting from the passenger's side. As the district court explained, "Haines got out of the van and ran." *Id.* at 2. According to Sprinkle, the officers, from their vantage point, did not see a rifle in the possession of either Haines or the other men.

Officers Sprinkle and Flick then approached the two men who were standing on the driver's side of the van, and they asked the men if they had any weapons on their persons or in the van. Both men responded in the negative and consented to a pat-down and a search of the van. No weapons were located, and Sprinkle immediately radioed to other officers in the area to alert them that a suspect was running from the van and might be armed. Moments later, another officer encountered Haines, who was approximately three houses from where the van was located. This officer drew his weapon and instructed Haines to lie on the ground. Sprinkle promptly arrived, handcuffed Haines, and took him to the police vehicle. After Haines was secured, Sprinkle retraced Haines's steps, and he discovered the rifle and scope in the first backyard that Haines had passed through. Sprinkle brought the rifle and scope back to the police vehicle, and he then read Haines his *Miranda* warnings. According to the district court, Haines thereafter "admitted that the firearm had been handed to him . . . [that] he was a convicted felon and that [he and his associates] were going to sell the weapon." *Id.*

The following month, a grand jury indicted Haines for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). His trial was scheduled for December 4, 2001, and he moved to suppress both his statements and the rifle, asserting that they constituted the fruit of an unconstitutional stop and arrest. After conducting a hearing on the suppression motion, the district court, in the Suppres-

sion Order of November 29, 2001, concluded that "[g]iven the totality of the circumstances known to the officers in this case, there was not reasonable, articulable suspicion that criminal activity was afoot, sufficient to conduct an investigatory stop of the defendant." *Id.* at 4. As a result, the court suppressed Haines's inculpatory statements. With respect to the rifle, however, the court concluded that "there was a reasonable suspicion that a firearm was in the area," and that "[a]ccordingly, the firearm itself will not be suppressed." *Id.* at 4-5. Following entry of the Suppression Order, the Government unsuccessfully moved to stay the trial pending appeal. On December 3, 2001, the Government filed its Notice of Appeal from the Suppression Order, certifying that its appeal was not taken for purposes of delay and that the suppressed statements were substantial proof of material facts in the proceeding.[1] The Government then sought a stay of trial in this Court, which we granted.

## II.

In reviewing a district court's suppression of evidence, we review its factual findings for clear error and its legal conclusions de novo. *United States v. Johnson*, 114 F.3d 435, 439 (4th Cir. 1997). And the question of "[w]hether an officer has such reasonable suspicion to justify a stop-and-frisk is subject to de novo review." *United States v. Swann*, 149 F.3d 271, 274 (4th Cir. 1998). Pursuant to the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), law enforcement officers may properly conduct a brief investigative stop of an individual when they possess reasonable suspicion, grounded in specific articulable facts, that he has been, is, or is about to be engaged in criminal activity.

## III.

On appeal, the Government asserts that the events occurring in connection with the surveillance operation of July 12, 2001, were suf-

---

[1]Pursuant to the second paragraph of 18 U.S.C. § 3731, the Government may take an interlocutory appeal of the suppression of evidence, so long as "the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding."

ficient to create a reasonable suspicion of ongoing criminal activity and justify the investigatory stop conducted on Haines. The Government maintains that, because the actions of the Richmond officers did not violate Haines's Fourth Amendment rights, the district court erred in suppressing his incriminating statements. As explained below, we agree.

A.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." The Supreme Court has long made clear, however, that "[t]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see also United States v. Place*, 462 U.S. 696, 702 (1982) (observing that *Terry* "implicitly acknowledged the authority of the police to make a *forcible stop* of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." (emphasis in original).

Reasonable suspicion, as we have succinctly observed, is a "commonsensical proposition." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). In determining whether an officer possessed reasonable suspicion to conduct an investigatory stop, we must consider "the totality of the circumstances confronting a police officer including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect." *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989). And in evaluating the information confronting officers, the court must credit "the practical experience of officers who observe on a daily basis what transpires on the street." *Lender*, 985 F.2d at 154. The Court has made clear that "[t]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause," and "is considerably less than proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7. The Fourth Amendment merely requires "'some minimal level of objective justification' for making the stop." *Id.* (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)). In

other words, an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Id.* (quoting *Terry*, 392 U.S. at 27).

B.

The events in Richmond on the morning of July 12, 2001, where this surveillance operation occurred, alerted the police officers that criminal activity was afoot, and that, in connection therewith, Haines posed a danger to both law enforcement and the general public. As such, the officers possessed a sufficient reasonable suspicion to conduct their investigatory stop, i.e., the "stop and frisk" procedure of Haines. The factors underlying this conclusion include the following:

First, Haines met the classic description of a criminal lookout. As the district court found, he "looked up and down the street several times" and then signaled to a man with a rifle and a scope to come out of the house. Suppression Order at 1. Second, Haines engaged in this suspicious behavior in a high-crime area where drug-dealing and violence is commonplace. As we have explained, "[w]hile a defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider." *Lender*, 985 F.2d at 154; *see also United States v. Constantine*, 567 F.2d 266, 267 (4th Cir. 1977) (recognizing that "an area's disposition toward criminal activity is an articulable fact"). Third, as the court explained, Officer Breedlove was then "aware of a possible connection between the van and a homicide." Suppression Order at 1. Fourth, and significantly, Officer Sprinkle and Sergeant Flick saw Haines exit the van and run away just as they arrived in the alley. As the Court cogently stated in *Illinois v. Wardlow*, "[h]eadlong flight — wherever it occurs — is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." 528 U.S. 119, 124 (2000). And finally, after searching the van and the two individuals standing next to its driver's side door, but not finding the rifle, the officers were reasonably entitled to believe that Haines, as the only other occupant of the van, was in possession of the rifle as he ran down the street.

Experienced officers, drawing reasonable inferences from Haines's behavior and the events of the morning of July 12, 2001, clearly possessed a reasonable suspicion to believe that criminal activity was afoot. As the Court observed in *Adams v. Williams*, 407 U.S. 143, 145 (1972), "[t]he Fourth Amendment does not require a policeman . . . to simply shrug his shoulders and allow a crime to occur." Furthermore, the officers knew that if Haines was carrying the rifle and the scope as he ran away, he posed a danger to both the officers and the general public. *See Terry*, 392 U.S. at 24 (recognizing need for "law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest"). As such, the investigatory stop of Haines was lawful under *Terry v. Ohio*, and the suppression of his statements was therefore erroneous.[2]

IV.

Pursuant to the foregoing, we reverse the Suppression Order, and we remand for such other and further proceedings as may be appropriate.

*REVERSED AND REMANDED*

---

[2]Haines also contends that his statements must be suppressed because the *Terry* stop conducted by the officers turned into an arrest without probable cause when they drew their weapons, handcuffed him, and then led him to a guarded police vehicle. Because the district court found that the stop of Haines was unconstitutional, it did not reach the question of whether the stop impermissibly turned into an arrest without probable cause, and that issue is therefore not now before us. Our prior decisions would indicate, however, that the officers' conduct did not turn the *Terry* stop into an arrest. *See, e.g.*, *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) ("[W]e have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."); *United States v. Perate*, 719 F.2d 706, 708-09 (4th Cir. 1983) (blocking individual's limousine with police vehicles and drawing weapons does not escalate stop into arrest).