**UNITED STATES of America**

v.

**Reginald JONES, III, Defendant.**

**No. Crim. L–02–0421.**

United States District Court,
D. Maryland.

Feb. 19, 2004.

Christopher J. Romano, James H. Green, Office of the United States Attorney, Thomas M. DiBiagio, Baltimore, MD, for Plaintiff.

Kenneth W. Ravenell, Schulman, Treem, Kaminkow, Gilden and Ravenell PA, Patrick Muhammad, Baltimore, MD, for Defendant.

*MEMORANDUM*

LEGG, Chief Judge.

Now pending before the Court is Defendant Reginald Jones, III's ("Jones") motion to suppress [Docket No. 2]. On December 17, 2003 and February 5, 2004, the Court heard testimony and argument on Jones's motion. For the reasons stated herein, the Court will, by separate Order filed this date, DENY Jones's motion.

## I. BACKGROUND

On August 29, 2002, Baltimore City Police officers arrested a man with crack-cocaine in his car. The man agreed on the spot to cooperate with the police by serving as a confidential informant ("CI"). The CI told Sgt. David Cheuvront ("Cheuvront") that a man named Reginald Jones was a local drug dealer who sold crack-cocaine in multi-ounce quantities. The CI also advised that Jones used two addresses: (i) 2920 Boarman Avenue in northwest Baltimore City, and (ii) 8 Mountbatten Court in the Woodlawn precinct of western Baltimore County. The CI warned Cheuvront that Jones often carried a gun.

Cheuvront cross-referenced the CI's information against public records, confirming that a Reginald Jones was listed as a resident at 2920 Boarman Avenue, that Jones had several arrests for violent crimes, and that Jones had a number of felony convictions for drug distribution and handgun violations.

Acting upon police instructions, and using his own cellphone, the CI called Jones's cellphone and placed an order for six ounces of crack-cocaine.[1] The CI and Jones agreed to meet that evening around 9 P.M. or 10 P.M. at a location to be determined.

After the call, Cheuvront contacted Sgt. Dennis O'Neill ("O'Neill"), a Baltimore County narcotics officer who often works in the Woodlawn precinct.[2] Cheuvront told O'Neill that Baltimore City was arranging to buy six ounces of crack-cocaine from a man named Reginald Jones, and that the buy would occur somewhere in the Baltimore area that evening. Cheuvront advised O'Neill of Jones's extensive criminal record, that Jones was known to carry a gun, and that Jones was connected to addresses at 8 Mountbatten Court and 2920 Boarman Avenue.

Sometime around 9:20 P.M. that evening, Jones called the CI, who was waiting with Cheuvront, to say that he was running late. Jones explained that, at that very moment, he was in a vehicle being stopped by the police for a burned-out headlight.[3] Jones did not describe the vehicle, give his precise location, or say whether he was the driver or a passenger.

After "hanging up" with Jones, the CI immediately related this information to Cheuvront, who-in turn-called O'Neill. O'Neill, who knew that the Mountbatten Court and Boarman Avenue addresses were in the Woodlawn area, personally contacted the police radio dispatcher for the Woodlawn precinct. O'Neill asked whether Woodlawn officers had anyone currently stopped for a headlight violation. To save time, O'Neill directed other officers to contact the dispatchers in the Wilson and Garrison[4] precincts, both of which

---

1. The CI placed the call to Jones using his own cellphone. Although Cheuvront was present, he could only hear the CI's half of the conversation.

2. Based on previous investigations, Cheuvront had a working relationship with O'Neill.

3. The parties agree that this stop was a mere coincidence.

4. At the suppression hearing, O'Neill testified that he asked another officer to contact the dispatcher in the Garrison precinct. The Baltimore County Police Department website lists three precincts on the western end of Baltimore County: Wilkens, Woodlawn, and Franklin. *See* http://www.co.ba.md.us/Agencies/police/pcpage.html (last visited Feb. 9,

border the Woodlawn precinct. These three precincts cover roughly the western half of Baltimore County.

O'Neill and his fellow officers determined that, in all three precincts, only Officer Eric Cross ("Cross") was currently conducting a traffic stop for a burned-out headlight.[5] By switching to the Woodlawn precinct's dispatch channel, O'Neill contacted Cross, advising him that Baltimore City Police were looking for a man named Jones who was bringing six ounces of crack-cocaine from the City to the County, that Jones was presently stopped for a headlight violation, and that Jones could be carrying a gun.

When O'Neill first contacted Cross, Cross was writing a repair order and attempting to verify the driver's identity (the driver had no license in his possession). Cross confirmed that he had pulled over a vehicle for a burned-out headlight, that two men were in the vehicle, and that the stop was occurring at the intersection of Liberty Road and Kelox Road. O'Neill recognized that this intersection was in the Woodlawn precinct, roughly halfway between the Boarman Road and Mountbatten Court addresses.

In light of this information, O'Neill directed Cross to remove and pat down the occupants. Recognizing the inherent danger to Cross, O'Neill, in a calm but commanding voice, directed Cross to call for back-up.[6]

Moments later, Officer Christopher Waite ("Waite") and other Baltimore County Police officers arrived. Cross ordered both men out of the vehicle. As Waite attempted to pat down the passenger's midsection, the passenger repeatedly twisted his pelvis away from Waite. Waite persisted with the pat-down, and his hands brushed against a flat, hard object just below the passenger's waistband. Fearing that the object was a weapon, Waite instinctively grasped the object firmly to immobilize it. Waite felt a large, hard, irregular object (roughly the size and shape of a hockey puck) wrapped in a plastic bag. At that point, Waite knew that the object was not a weapon. Nevertheless, Waite extracted the object from Jones's "dip" area because he believed that he had found drugs. The object proved to be a six ounce chunk of crack-cocaine wrapped in a plastic bag. Waite placed the passenger (later identified as Jones) under arrest.

After being advised of his *Miranda* rights, Jones agreed to speak with law enforcement officers on the scene. Jones told the officers that (i) he retrieved the crack found on his person from a drainpipe near his apartment, (ii) he planned to sell the drugs to a man named Rico for $1,600, (iii) he often hid drugs at 8 Mountbatten Court, (iv) he used his girlfriend's apartment as a place to hide drugs, and (v) he often purchased crack from a man named Naz.

## II. *ANALYSIS*

Jones moves to suppress the crack, arguing that the initial pat-down was not

---

2004). The Court assumes that the Garrison precinct is the same as the Franklin precinct.

**5.** O'Neill admitted that he could not remember precisely what his fellow officers reported about the neighboring precincts. He recalled, however, that there was only one traffic stop for a burned-out headlight then in progress.

**6.** The transcript, literally read, is not without confusion. On the transcript, O'Neill tells Cross to use his discretion in patting down the occupants. The transcript was supplemented by the testimony of O'Neill and Cross, as well as a tape recording that conveys the officers' inflections. It is clear, and the Court so finds, that O'Neill made the ultimate decision to pull the occupants out of the car and pat them down.

justified by reasonable articulable suspicion or probable cause. Jones also contends that Waite was not justified in removing the object from his waistband once Waite realized that the object was not a weapon and posed no threat. Jones argues, in any event, that the duration of the traffic stop exceeded the constitutionally permissible duration before the police had reasonable articulable suspicion to detain him. Any statements he made to the police after his arrest are fruit of the poisonous tree, Jones contends.

The government argues that the stop was justified by reasonable articulable suspicion and by probable cause. The government further contends that Waite was justified in seizing the object because, by the time he realized it was not a weapon, he had probable cause to believe that the object was drugs. Moreover, the duration of the traffic stop was reasonable, the government argues.

### A. The Initial Pat–Down

"Police may conduct a patdown search without a warrant if, under the totality of the circumstances, the officer has an articulable, reasonable suspicion that a person is involved in criminal activity and that he is armed." *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir.1998) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Officers Cross and Waite did not have first-hand knowledge of the facts supporting a reasonable suspicion that the occupants of the car were armed. They were, however, entitled to rely on the observations of their fellow officers.[7]

Thus, the question becomes whether the officer who ordered the pat-down (O'Neill) had a reasonable articulable suspicion to believe that the occupants of the car were armed.

■ O'Neill was clearly justified in authorizing the pat-down. He knew that (i) the Baltimore City police were setting up a crack sale that evening with a man named Reginald Jones, (ii) Jones had an extensive criminal record, including felony drug and gun convictions, (iii) Jones was known to carry a gun, (iv) drug dealers often carry guns for protection, (v) Jones was tied to addresses in and around the Woodlawn precinct, (vi) Jones was, at that moment, in a car stopped by the police with a headlight out, (vii) Cross was the only officer in any of Baltimore County's west end precincts conducting a traffic stop for a burned-out headlight, and (viii) Cross was conducting the stop at the intersection of Liberty and Kelox, midway between the two addresses connected to Jones, along a route one would normally take when traveling between these locations. Given this knowledge, O'Neill clearly had reasonable articulable suspicion to believe that Jones was in the car at Liberty and Kelox, and that he was armed.

### B. The Removal of the Object

Because O'Neill was justified in ordering the pat-down of the vehicle's occupants, Waite was entitled "to conduct a limited search of [Jones's] outer clothing to discover any weapons." *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir.1998). Once Waite suspected a weapon, he was entitled to control the object by grasping it.[8]

---

7. "Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department." *United*

States *v. Hensley*, 469 U.S. 221, 233, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (internal citations omitted).

8. On cross-examination, Jones's Counsel vigorously challenged Waite's assertion that he initially believed the object to be a weapon. No reasonable police officer could believe, even on first impression, that the irregular

■ Upon grasping the object and recognizing it as drugs, Waite was entitled to seize the object under the so-called "plain feel" doctrine. "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent ... if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plan-view context." *Minnesota v. Dickerson*, 508 U.S. 366, 375–76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

Although the plain feel doctrine requires that the incriminating character be immediately apparent, it does not require absolute certainty that the object is contraband. To the contrary, the plain feel doctrine, like the plain view doctrine, only requires that the officer have probable cause to believe that the object is contraband by the time he realizes it is not a weapon. *Arizona v. Hicks*, 480 U.S. 321, 327, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *see also Dickerson*, 508 U.S. at 376, 113 S.Ct. 2130.

The Court finds that Waite had probable cause to believe that the object was a lump of drugs. Waite is a veteran officer with substantial knowledge of the drug trade. Jones repeatedly twisted away from Waite, indicating that he was concerned about what Waite might find. The object was not in Jones's pocket, but in his "dip" area, a place where criminals often hide guns and drugs. The object's shape, size, and packaging were consistent with a lump of crack-cocaine or another controlled dangerous substance. Waite was conducting a pat-down of a suspected crack dealer. Given the totality of the circumstances, the seizure was lawful.[9]

## C. *Duration of the Traffic Stop*

O'Neill first spoke to Cross while Cross was writing up a repair order and verifying the driver's identity (the driver had no license in his possession). Jones argues that O'Neill requested Cross to "write slow" in order to give O'Neill more time to assess the situation.[10] Jones contends that O'Neill decided to pat down the two men only after the time normally required to write a repair order had expired. Accordingly, Jones's detention exceeded a constitutionally permissible duration before the *Terry* frisk was conducted, he argues.

■ The Court disagrees. It normally takes Cross ten to fifteen minutes to write a repair order. The Court accepts Cross's testimony that (i) only twenty minutes had elapsed between the initial stop and the pat-down of Jones, and (ii) he wrote the repair ticket at normal speed. This head-

shaped object in Jones's "dip" area could fit the profile of a weapon, Jones's Counsel contended. The Court disagrees, and credits Waite's testimony. Nothing in Waite's demeanor suggested that he was shading the truth. Weapons come in all different shapes and sizes, and police officers, who are often forced to make split-second decisions, are entitled to rely upon their reasonable first impressions.

**9.** The facts of *Dickerson* do not support Jones's motion. In *Dickerson*, the officer conducting the pat-down determined that a small lump he felt in the front pocket of the suspect's jacket was contraband "only after 'squeezing, sliding and otherwise manipulat-

ing the contents of the defendant's pocket'-a pocket which the officer already knew contained no weapon." *Dickerson*, 508 U.S. at 378, 113 S.Ct. 2130 (quoting the lower court). Here, Waite had probable cause to believe the object was drugs the moment he firmly grasped it.

**10.** The transcript shows that, at the time of the stop, someone said, "Can you write slow?" (Tr. at 29:3–4.) At the hearing, Cross testified that he did not hear anyone ask him to "write slow," and suggested that the transcript might have recorded an unrelated conversation between officers not involved in the investigation of Jones. The Court credits Cross's testimony.

light stop took longer than normal because the driver failed to produce any identification. Cross returned to his squad car to contact headquarters to verify the driver's identity and make sure that the car was not stolen. These steps corroborate Cross's testimony by explaining the extra few minutes needed for this stop. Accordingly, there was no Constitutional violation.

Assuming *arguendo* that Cross dragged out the repair ticket stop at O'Neill's direction, the Court would find no violation. O'Neill had already learned that Cross was stopping a vehicle with a burned-out headlight, and he was entitled to maintain the status quo briefly while he gathered information. A court assessing the duration of a traffic stop "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Given the situation facing O'Neill, a decision by him to prolong the headlight stop by five or ten minutes would be too short a time to make a Constitutional difference.

### D.  *Jones's Statements*

Because the initial pat-down and removal of the crack were lawful, the statements Jones made to the police after receiving *Miranda* warnings are admissible.

### III.  *CONCLUSION*

For the reasons stated herein, the Court will, by separate Order filed this date, DENY Jones's motion to suppress.