**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-4889

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

REGINALD JONES, III,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Benson Everett Legg, Chief District Judge.
(1:02-cr-00421-BEL)

Argued:  May 15, 2008               Decided:  August 20, 2008

Before WILKINSON and GREGORY, Circuit Judges, and Henry F. FLOYD,
United States District Judge for the District of South Carolina,
sitting by designation.

Affirmed by unpublished per curiam opinion.  Judge Gregory wrote a
dissenting opinion.

**ARGUED:** Kenneth Wendell Ravenell, Baltimore, Maryland, for
Appellant.  Christopher John Romano, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Rod J.
Rosenstein, United States Attorney, Baltimore, Maryland, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Reginald Jones III appeals the district court's denial of a motion to suppress evidence seized during and statements made following a traffic stop. For the reasons stated below, we affirm the district court's denial of Jones' motion to suppress.

I.

A.

On the afternoon of August 29, 2002, Baltimore City Police officers arrested an individual for a narcotics violation. That individual agreed to cooperate with the police by serving as a confidential informant (CI). The CI told Sergeant David Cheuvront that Jones was a local drug dealer who sold crack-cocaine in multi-ounce quantities. The CI also advised that Jones used two addresses: 2920 Boarman Avenue in northwest Baltimore City and 8 Mountbatten Court in the Woodlawn precinct of western Baltimore County. The CI further warned Cheuvront that Jones often carried a gun.

Cheuvront cross-referenced the CI's information against public records and confirmed that (1) a Reginald Jones was listed as a resident at 2920 Boarman Avenue and (2) Jones had "an extensive record to include crimes of violence, handgun violations, and several [controlled dangerous substances] arrests." (J.A. at 30-31.) Thereafter, acting on police instruction and using his own

2

cell phone, the CI called Jones and made arrangements to purchase six ounces of crack-cocaine. Cheuvront could hear the CI's portion of the conversation. The CI and Jones agreed to meet that evening around 9:00 or 10:00 at a location to be determined.

Cheuvront then contacted Sergeant Dennis O'Neill with the Baltimore County Police Department and advised him that Baltimore City officers were working with a CI to arrange a meeting with Jones somewhere in the Baltimore area to purchase crack-cocaine that evening. If the meeting took place in Baltimore County, Cheuvront would need O'Neill's assistance because Baltimore County was outside of Cheuvront's jurisdiction. Cheuvront also told O'Neill about Jones' criminal record, that Jones was known to carry a gun and was connected to the two addresses.

At approximately 9:20 that evening, the CI spoke with Jones, who told the CI that he was running late because he was in a vehicle being stopped by the police for a burned-out headlight. Jones did not describe the vehicle, give the precise location, or say whether he was the driver or a passenger.

After receiving this information from the CI, Cheuvront contacted O'Neill to inform him that Jones was currently stopped. O'Neill knew that one of the two addresses associated with Jones was in the Woodlawn area and contacted the police radio dispatcher for the Woodlawn precinct to determine whether officers had anyone currently stopped for a headlight violation. O'Neill also directed

3

other officers to contact dispatchers in the Wilkens and Garrison precincts, both of which border the Woodlawn precinct. Together, the Woodlawn, Wilkens and Garrison precincts cover roughly the western half of Baltimore County.

O'Neill determined that several stops had been made and that one of the stops was based on a headlight violation. O'Neill contacted Officer Eric Cross, who was conducting the headlight violation stop, and advised Cross that Baltimore City Police were looking for a man named Jones, who was believed to be bringing six ounces of crack-cocaine from Baltimore City to Baltimore County. O'Neill also told Cross that Jones was currently stopped for a headlight violation and that he could be carrying a gun.

Cross confirmed that he had pulled over a vehicle for a burned-out headlight, that two men were in the vehicle, and that the stop was occurring at the intersection of Liberty Road and Kelox Road. O'Neill recognized that this intersection was roughly halfway between the two addresses associated with Jones. In light of this information, O'Neill directed Cross to call for backup and to remove and pat down the occupants.

Thereafter, Officer Christopher Waite and other Baltimore County Police officers arrived. Cross ordered both men out of the vehicle, and Waite began to pat down Jones. As Waite attempted to pat down Jones' midsection, Jones repeatedly twisted his pelvis away from Waite. Waite persisted with the pat down, and his hands

4

brushed against a flat, hard object just below Jones' waistband. According to Waite, he believed the object to be a weapon and grasped the object firmly to immobilize it. He felt a large, hard, irregular object, roughly the size and shape of a hockey puck, wrapped in a plastic bag. At that point, Waite knew that the object was not a weapon, but Waite removed the object because he believed that he had found narcotics. The object proved to be roughly six ounces of crack-cocaine. Waite then placed Jones under arrest. After being advised of his Miranda rights, Jones agreed to speak with law enforcement officers on the scene.

B.

On September 19, 2002, a grand jury in the District of Maryland returned a one-count indictment against Jones. The indictment charged Jones with possession with intent to distribute cocaine base. See 21 U.S.C. § 841. Jones filed a motion to suppress any evidence seized during the August 29, 2002, traffic stop and any statements made to the police following that stop. On February 19, 2004, the district court issued a memorandum opinion and order denying the motion to suppress.

On June 2, 2004, Jones tendered a conditional guilty plea to Count One of the indictment. He preserved his right to appeal the district court's denial of his motion to suppress. The district court accepted Jones' conditional guilty plea and convicted him of one count of possession with intent to distribute cocaine base.

Jones was then sentenced to a term of imprisonment of 151 months. Jones filed a timely appeal, challenging the district court's denial of his motion to suppress.

## II.

Jones argues that (1) there was no reasonable articulable suspicion for the officers to conduct a pat down of Jones; (2) Waite conducted an illegal search of Jones; (3) Jones' detention exceeded a constitutionally permissible duration before the Terry frisk was conducted; and (4) the statements made by Jones should have been suppressed.

We review for clear error a district court's factual findings underlying the denial of a motion to suppress, while its legal conclusions are reviewed de novo. United States v. Rusher, 966 F.2d 868, 873 (4th Cir. 1992). When reviewing the denial of a motion to suppress, the evidence is construed in the light most favorable to the Government. United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998).

## A.

Jones first contends that there was no reasonable articulable suspicion for the police to conduct a pat down. Jones maintains that the district court relied on factors that were either not sufficiently proven during the suppression hearing or were not

appropriate factors to rely on in determining reasonable articulable suspicion.

1.

We begin with a review of Fourth Amendment law relating to traffic stops. Police officers are justified in stopping an automobile where a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996). During a routine traffic stop, police officers may order, as a matter of course, a driver and passengers to exit a vehicle with no more suspicion than that justifying the traffic stop itself. Maryland v. Wilson, 519 U.S. 408, 415 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977). Moreover, pursuant to the Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968), a pat down, or "frisk," is permitted "when the officer perceive[s] an appropriate level of suspicion of criminal activity and apprehension of danger." United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998).

Terry's "reasonable suspicion" standard is not reduced to a "neat set of legal rules," but is a "commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (internal quotations and citations omitted). Accordingly, "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what

7

transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

When assessing whether an officer had reasonable suspicion for a Terry frisk, a court must consider the totality of the circumstances. United States v. Sprinkle, 106 F.3d 613, 618 (4th Cir. 1997). Reasonable suspicion is a "less demanding standard than probable cause," requiring a showing "considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). This Court has held that the reasonable suspicion standard "may be satisfied by an officer's objectively reasonable suspicion that drugs are present in a vehicle that he lawfully stops." Sakyi, 160 F.3d at 169. Because guns often accompany drugs, when an officer suspects the presence of drugs in a stopped vehicle, the risk of danger to the officer is apparent. Id.

2.

In the case before us, the police officers had reasonable suspicion to conduct a pat down of Jones. The officers knew that (1) a CI had arranged a meeting with Jones for that evening to purchase crack-cocaine; (2) Jones had an extensive criminal record, including drug and gun charges; (3) Jones used two addresses, one in northwest Baltimore City and one in the Woodlawn precinct of western Baltimore County; (4) Jones was in a vehicle being stopped by the police for a burned-out headlight; (5) Cross was the only officer in the western half of Baltimore County who had stopped a

8

car for a headlight violation; and (6) Cross was conducting the stop at the intersection of Liberty Road and Kelox Road, roughly halfway between the two addresses associated with Jones. Taken together, these factors establish that the officers had reasonable suspicion to believe that criminal activity was afoot.

Specifically, the officers had reasonable suspicion to believe that Jones had drugs in the vehicle. Because guns often accompany drugs, the risk of danger to Cross was apparent. See id. Cross called for backup before ordering the driver and Jones out of the vehicle for the pat down, providing further evidence that Cross was concerned about his safety.

Jones contends that the evidence was insufficient to establish that Jones was the person who would be meeting the CI to conduct the transaction. However, Cheuvront testified that the CI stated that he could contact Jones "by telephone and order up a quantity of crack cocaine, and that he would then meet . . . Jones to get the crack cocaine from him." (J.A. at 31-32.) Cheuvront also had an independent recollection that the CI stated that Jones was on his way to meet with the CI. (J.A. at 45-48, 52.)

Jones also challenges the officers' reliance on the CI, arguing that the CI had not been proven to be reliable and that the information provided by the CI was uncorroborated. This case does not present us with a situation in which we are concerned about the reliability of the CI. The CI was not an anonymous informant.

9

Instead, the CI was face to face with the officers, told the officers that he could place a call to Jones to order drugs, and did in fact place that call in the presence of Cheuvront. Moreover, Cheuvront cross-referenced the CI's information against public records and confirmed (1) that a Reginald Jones was listed as a resident at 2920 Boarman Avenue and (2) that Jones had "an extensive record to include crimes of violence, handgun violations, and several [controlled dangerous substances] arrests." (J.A. at 30-31.) The CI also provided the officers with the information that Jones had been stopped for a headlight violation, a fact that the CI knew was subject to verification.

Under a totality of the circumstances, we hold that the pat down of Jones was justified because the officers had a reasonable suspicion that criminal activity was afoot.

B.

Having concluded that the pat down was justified, we turn next to Jones' contention that Waite conducted an illegal search of Jones. Jones argues that Officer Waite exceeded the bounds of a Terry stop by removing the object from Jones' waistband after realizing that the object was not a weapon and posed no threat.

1.

As previously observed, if an officer has a reasonable suspicion of criminal activity, he may conduct a limited search of outer clothing to discover any weapons. Terry, 392 U.S. at 27.

10

"[C]ontraband discovered during a lawful Terry stop is admissible so long as the search does not exceed the bounds permitted by Terry." United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998) (citing Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (setting forth the "plain feel" doctrine)). If an officer, while conducting a pat down, "feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." Dickerson, 508 U.S. at 375. On the other hand, "[o]nce an officer has determined that the object is not a weapon . . . and if its shape or size does not indicate its contraband nature, the search must stop." Raymond, 152 F.3d at 312 (citing Dickerson, 508 U.S. at 378).

## 2.

Jones argues that

> [b]ecause Terry frisks are not meant to discover evidence of a crime, but rather are limited to a search for weapons that might endanger the officer or the public, it was not permissible for . . . Waite to continue his search and remove the object from Jones'[] waistband once he determined that the object was not a weapon.

(Appellant's Br. 23.) To the contrary, Waite was justified in removing the contraband under the "plain feel" doctrine.

When Waite began to pat down Jones, Jones started to "cant his middle section away from [Officer Waite]," (J.A. at 253), and "continu[ed] to spin, to keep that section away from the search," (J.A. at 254). This movement indicated to Waite that Jones was

11

concerned about something Waite might find.  When Waite was able to search Jones' midsection, Waite felt a "hard object" that he initially thought was a weapon.  (J.A. at 254.)

After feeling the object, Waite grabbed it to immobilize it. Once he secured it, he realized that the object was not a weapon, but instead a large, hard, irregular object, roughly the size and shape of a hockey puck, wrapped in a plastic bag.  At that point, he removed the object, believing it to be a controlled dangerous substance.  Waite was justified in removing the contraband and there was no invasion of Jones' privacy beyond that already authorized by Waite's search for weapons. See Dickerson, 508 U.S. at 375.

## C.

Jones next avers that his detention exceeded a constitutionally permissible duration before the Terry frisk was conducted.  Specifically, Jones contends that the detention lasted longer than necessary to effectuate the purpose of the traffic stop.

## 1.

During a routine traffic stop, a police officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (citing United States v. Rusher, 966 F.2d 868, 876-77 (4th Cir. 1992)).  Once the driver has shown that he is entitled

12

to operate the vehicle and the police officer has issued the citation, the driver "must be allowed to proceed on his way." Rusher, 966 F.2d at 876.  If, however, the driver obstructs the police officer's efforts in any way, a longer traffic stop would be reasonable.  See United States v. Sharpe, 470 U.S. 675, 687-88 (1985) (rejecting the argument that "a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute[d] to the added delay about which he complains").

A stop "justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005).  Thus, a prolonged traffic stop requires either (1) the driver's consent or (2) a reasonable suspicion that illegal activity is afoot.  Foreman, 369 F.3d at 781.

2.

The district court found that twenty minutes had elapsed between the initial stop and the pat down of Jones, and we are unaware of any case holding that a twenty-minute detention for a traffic stop is unconstitutional.  Cross was entitled to detain Jones after observing the headlight violation.  Cross testified that he was writing a repair order for the headlight violation and that it usually took him ten to fifteen minutes to write a repair

13

order.  This stop took longer because the driver failed to produce any identification.  Therefore, Cross had to return to his squad car to contact headquarters to verify the driver's identity and to ensure that the car was not stolen.  Accordingly, we hold that Officer Cross' twenty-minute detention of Jones was constitutional.

D.

Jones' remaining argument is that the statements made by him after the stop should have been suppressed.  Specifically, he asserts that "because the initial pat down and removal of the crack cocaine . . . were unlawful, the statements made by Jones to the police officers following his arrest should be suppressed as fruit of the illegal search and seizure of Jones."  (Appellant's Br. 27.) Having rejected Jones' arguments that the search and seizure were illegal, we also reject Jones' final argument.

III.

In sum, for the foregoing reasons, we affirm the district court's denial of Jones' motion to suppress.

AFFIRMED

14

GREGORY, Circuit Judge, dissenting:

Today, the Majority affirms the district court's denial of Jones's motion to suppress. I agree with the Majority's conclusion that the police had reasonable articulable suspicion to conduct a Terry frisk of Jones. However, I disagree with the Majority that the facts in this case comport with the plain feel doctrine. The police exceeded the scope of their Terry frisk when they realized that the object in Jones's pocket was not a weapon. Although it was not immediately apparent that it was contraband the police continued to manipulate Jones's pocket until they discovered the non-weapon object was in a plastic bag. Because "an officer's 'squeezing, sliding, and otherwise manipulating the contents of [a] defendant's pocket', if the officer knows the pocket contains no weapon, is prohibited," United States v. Swann, 149 F.3d 271, 275 (4th Cir. 1998) (citing Minnesota v. Dickerson, 508 U.S. 366, 378 (1993)), I must respectfully dissent.

"When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a patdown search to determine whether the person is in fact carrying a weapon." Dickerson, 508 U.S. at 373-374; see also Swann, 149 F.3d at 274. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence...."

15

<u>Dickerson</u>, 508 U.S. at 373-374. "Rather, a protective search-permitted without a warrant and on the basis of reasonable suspicion less than probable cause-must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." <u>Id.</u> "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under <u>Terry</u> and its fruits will be suppressed." <u>Id.</u>

An exception to this rule is the plain feel doctrine. The plain feel doctrine is analogous to the plain view doctrine, <u>see</u> <u>Dickerson</u>, 508 U.S. at 375, which permits the police to seize an item without a warrant if: (1) the "police are lawfully in a position from which they view an item," (2) "its incriminating character is <u>immediately apparent</u>," and (3) "the officers have a lawful right of access to the object." <u>Dickerson</u>, 508 U.S. at 375 (emphasis added). "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting further search of the object--i.e., if 'its incriminating character [is not] immediately apparent,' the plain-view doctrine cannot justify its seizure." <u>Id.</u> (citing <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987)). As the Supreme Court explained in <u>Dickerson</u>, "[t]he rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate

16

expectation of privacy and thus no 'search' within the meaning of the *Fourth Amendment*--or at least no search independent of the initial intrusion that gave the officers their vantage point." Id.

In a plain feel case, we have held that "an officer's 'squeezing, sliding, and otherwise manipulating the contents of [a] defendant's pocket', if the officer knows the pocket contains no weapon, is prohibited." Swann, 149 F.3d at 275. "An officer is not justified in conducting a general exploratory search for evidence under the guise of a stop and frisk." Id. at 274.

Officer Waite testified that when he patted Jones, he "felt a hard object below his waist line." (J.A. 254.) He testified that he believed it might be a weapon. Officer Waite also testified that "[t]o be quite honest, it was roughly the size of a hockey puck, and when [he] grabbed the object, it felt like the flat side of a weapon until [he] grabbed down on it." Id. After feeling around some more, Officer Waite realized that the object, which he now thought was not a weapon, was in a plastic bag. I conclude that Officer Waite's decision to probe further after realizing that the hockey puck shaped item was not a weapon was akin to the situation in Swann where an officer manipulated the contents of the defendant's sock further to determine what was the object in his sock. It was not until Officer Waite realized that the object was inside a plastic bag that he believed it to be contraband. For the

foregoing reasons, I would reverse the district court's denial of Jones's motion to suppress.