**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Collins Kusi SAKYI, Defendant–Appellant.**

No. 97–4813.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 25, 1998.

Decided Oct. 30, 1998.

---

**ARGUED**: Robert Stanley Powell, Arlington, Virginia, for Appellant.  Marlene Mary Wahowiak, Special Assistant United States Attorney, Office of United States Attorney, Alexandria, Virginia, for Appellee.  **ON BRIEF**: Helen F. Fahey, United States Attorney, Office. of United States Attorney, Alexandria, Virginia, for Appellee.

Before NIEMEYER and WILLIAMS, Circuit Judges, and MAGILL, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by published opinion.  Judge NIEMEYER wrote the opinion, in which Judge WILLIAMS and Senior Judge MAGILL joined.

### OPINION

NIEMEYER, Circuit Judge:

In this case we must decide whether a passenger in an automobile may lawfully be "patted down" in connection with a lawful traffic stop before a search of the vehicle for suspected drugs.  We hold that because the officer had an objectively reasonable suspicion of criminal activity and a legitimate concern about his own safety, he acted lawfully under the Fourth Amendment in "patting down" the passenger.

I

During the evening rush hour on April 2, 1997, United States Park Police Officer Frank Joseph Ferstl observed an automobile enter the George Washington Memorial Parkway from Washington Street south of Alexandria, Virginia, and noticed that one of the vehicle's brake lights was not functioning.  After Ferstl stopped the car and requested that the driver, Antonio Gunn, produce a license and registration, Gunn said that he "did not have his license with him."  When Gunn opened the glove box to retrieve the registration, Officer Ferstl observed a Phil-

lies Blunt cigar box. In Officer Ferstl's experience, "almost all the times [he has] come into contact with Philly Blunt boxes, there has also been—there has been evidence of marijuana. The cigars are used, commonly used to roll marijuana cigarettes." Officer Ferstl claimed that he had been involved in "several hundred" cases in which marijuana and Phillies Blunt cigar boxes were found together.

When Officer Ferstl pressed Gunn further on whether he had a driver's license at all or whether it was suspended, Gunn said he "never had a license." Despite what Gunn said, Officer Ferstl suspected that Gunn's license had been suspended. Officer Ferstl then asked the passenger in the car, Collins Sakyi, for identification, inquiring whether he had a valid driver's license, with the thought that Sakyi could drive the car home. Sakyi claimed that he too did not have his license with him. He orally gave Officer Ferstl identification information, which Ferstl did not discover was false until he returned later to the police station. Officer Ferstl requested a check on Gunn's driver's license through Park Police communications and asked Gunn to step to the rear of the car while waiting for the information. While waiting, Officer Ferstl asked Gunn if he had anything illegal in the car. Gunn said no and granted Officer Ferstl's request to search the vehicle. When the Park Police communications revealed that Gunn's license had been revoked, Officer Ferstl waited for the arrival of Lieutenant David Stover as backup before placing Gunn under arrest for driving on a revoked license. He handcuffed Gunn and placed him in the rear seat of the police cruiser under Lt. Stover's observation.

Before searching the vehicle, Officer Ferstl asked Sakyi to step to the rear of the vehicle and conducted a "pat-down" of Sakyi's outer clothing "to make sure the scene was safe before[Ferstl] went into the vehicle." As Officer Ferstl moved his hands down Sakyi's right leg, a large piece of tin foil fell to the ground containing a large, white, rock substance which Officer Ferstl believed to be crack cocaine. Officer Ferstl then arrested Sakyi for suspected possession of cocaine. A later field test confirmed that the substance

was crack cocaine. Officer Ferstl's subsequent search of the vehicle produced a Remington 522 Viper .22 caliber rifle which both Gunn and Sakyi spontaneously claimed was a BB gun.

At a hearing on Sakyi's motion to suppress the evidence of cocaine, Officer Ferstl testified that he had not conducted a "search" of Sakyi but only "patted him down for weapons" because he was going to search the vehicle and he wanted, for his own protection, "to ensure that the area [was] safe." Officer Ferstl acknowledged that before he frisked Sakyi he did not have reason to believe that Sakyi had committed any criminal offense. Furthermore, as Sakyi exited the vehicle, Officer Ferstl did not observe any bulges in Sakyi's clothing, although he testified that he would not readily have been able to see any because Sakyi was wearing loose clothing. Officer Ferstl also testified that nothing Sakyi did caused Ferstl to fear for his safety.

Both Officer Ferstl and Lt. Stover, however, noted that the area on the George Washington Parkway where Officer Ferstl stopped Gunn was a high-crime area. Lt. Stover stated that the area was across the street from a marina and from the Jones Point Park which were "probably the two highest areas where we make arrests for[the possession of weapons and drugs] on that end of the Parkway."

After Sakyi was indicted for possessing five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1), he filed a motion to suppress the evidence obtained by Officer Ferstl during the stop, arguing that the "pat-down" violated his Fourth Amendment right to be free from unreasonable searches. Sakyi argued that Officer Ferstl had no evidence to believe that he was engaged in any criminal activity; he had merely been "sitting in the vehicle in which he was a passenger." The district court denied the motion, concluding that the circumstances provided Officer Ferstl with a reasonable, articulable suspicion that Sakyi had engaged in criminal activity, justifying the "pat-down" under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. The district court based its conclu-

sion on the totality of the circumstances surrounding the "pat-down," including the facts that (1) the traffic stop occurred in an area with a high incidence of crimes involving drugs and guns, (2) in the glove box of the vehicle, Officer Ferstl observed a Phillies Blunt cigar box which, in his experience, is commonly associated with marijuana, (3) Sakyi did not have identification, and (4) Sakyi wore loose clothing which could have concealed a weapon.

Sakyi thereafter pled guilty to the charged offense, reserving his right to challenge the district court's ruling on his suppression motion, see Fed.R.Crim.P. 11(a)(2), and the district court sentenced him to 37 months imprisonment. This appeal followed.

## II

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "Reasonableness" is determined by weighing the "public interest" against the "individual's right to personal security free from arbitrary interference by law officers." *Id.* at 109, 98 S.Ct. 330 (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *see also Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 885, 137 L.Ed.2d 41 (1997). The public interest, as the parties agree, includes the substantial public concern for the safety of police officers lawfully carrying out the law enforcement effort. Thus, the issue presented requires us to determine whether Officer Ferstl's safety concerns were legitimate and, if they were, whether under the circumstances they outweighed Sakyi's right to be free from the intrusion of a "pat-down."

The foundation for our analysis was established in *Terry v. Ohio* where the Supreme Court held that police officers confronting citizens on the street in objectively suspicious circumstances may, without probable cause, conduct a limited search—a "frisk" or "pat-down"—for weapons when a reasonably prudent officer in similar circumstances would believe that his safety or the safety of others was in danger. 392 U.S. at 27, 88 S.Ct. 1868. To determine whether an officer could reasonably hold such a belief, the Court stated that "due weight must be given ... to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Id.* The Court recognized the strong public interest in officer safety, stating that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Id.* at 23, 88 S.Ct. 1868.

Applying *Terry* principles to routine traffic stops, the Court in *Mimms* held that a police officer, "as a matter of course," may order the *driver* of a lawfully stopped car out of his vehicle. 434 U.S. at 110, 98 S.Ct. 330. The Court observed that because the car was already lawfully stopped, it was not evaluating the intrusion resulting from the stop, but only the "incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped." *Id.* at 109, 98 S.Ct. 330. The Court weighed the public interest in the safety of police officers, which it characterized as "both legitimate and weighty," *id.* at 110, 98 S.Ct. 330, against the additional intrusion of requiring the driver to exit the vehicle, which it characterized as "*de minimis*," resulting in a "petty indignity." *Id.* at 111, 98 S.Ct. 330. The Court concluded that the public interest justified the practice.

The same officer-safety considerations that were applied in *Terry* and *Mimms* prompted the Court in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), to hold that when a police officer lawfully stops a vehicle and possesses "a reasonable belief based on 'specific and articulable facts' ... that the suspect is dangerous and ... may gain immediate control of weapons," the officer may search the areas of the passenger compartment of the automobile where "a weapon

may be placed or hidden." *Id.* at 1049, 103 S.Ct. 3469 (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868). The Court based its reasoning in part on the reality that such stops involve an investigation " 'at close range' when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger....' " *Id.* at 1052, 103 S.Ct. 3469 (quoting *Terry,* 392 U.S. at 24, 28, 88 S.Ct. 1868). Thus, in the context of a lawful automobile stop when the officer is presented with an objectively suspicious and potentially dangerous circumstance, the officer may conduct what amounts to a " 'frisk' of an automobile for weapons." *Maryland v. Buie,* 494 U.S. 325, 332, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (construing *Long* in the context of upholding, for safety reasons, a protective sweep of a house where a suspect had been arrested).

And finally, in *Maryland v. Wilson,* the Supreme Court, relying again on the same public interest in police safety, held that police officers making lawful traffic stops could require *passengers* to step out of the vehicle as a matter of course. *See* 117 S.Ct. at 886. Explaining its extension of *Mimms* to passengers, the Court stated that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." *Id.* Recently, we applied both *Mimms* and *Wilson* to hold that officers approaching a vehicle with heavily tinted windows could open its doors to determine "whether the vehicle is occupied by one or several persons and whether the vehicle's occupants are armed or have access to weapons." *United States v. Stanfield,* 109 F.3d 976, 982 (4th Cir.1997).

We must now decide, in light of these authorities, what justification a police officer must have to conduct a "pat-down" for weapons of a passenger in a lawfully stopped vehicle. In *Terry,* the frisk was justified by a reasonable, articulable suspicion that criminal activity was afoot and by the risk of danger that arises from officer action divorced from the safeguards of a full-blown arrest. Similarly, in *Long,* the search of the area within the passenger compartment of the automobile was supported by specific and articulable facts that the suspect was dangerous and might have immediate access to weapons. On the other hand, in *Mimms* the Court announced a bright-line rule permitting police officers effecting a traffic stop to order, as a matter of course, the driver to step out of the automobile with no more suspicion than that justifying the traffic stop itself. And in *Wilson,* the Court extended *Mimms* to passengers.

All of these cases recognize generally that every traffic stop poses a meaningful level of risk to the safety of police officers. In *Mimms* and *Long,* for instance, the Court alluded to a 1963 study demonstrating that "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." *Mimms,* 434 U.S. at 110, 98 S.Ct. 330; *Long,* 463 U.S. at 1048 n. 13, 103 S.Ct. 3469. And in *Wilson,* the Court referred to 1994 statistics demonstrating that in that year 5,762 officers were assaulted and 11 were killed during traffic pursuits and stops. *See Wilson,* 117 S.Ct. at 885. In *Terry,* the Court noted more generally that the "easy availability of firearms ... is relevant to an assessment of the need for some form of self-protective search power." *Terry,* 392 U.S. at 24 n. 21, 88 S.Ct. 1868. Similarly, in *Stanfield,* we observed that the substantial risk to police officers during traffic stops is "too plain" for argument. 109 F.3d at 981. "[T]he risk these officers face when they approach a vehicle with heavily tinted windows is, quite simply, intolerable." *Id.* at 982. We noted that at least 28 states responded to this risk by passing statutes seeking to reduce the risk to police officers by prohibiting tinted windows. *Id.*

██ Only *Mimms* and *Wilson,* however, rely on this generalized risk to justify police action, finding it sufficient justification to order occupants to exit a lawfully stopped vehicle. By contrast, *Terry* and *Long* require a specific, articulable suspicion of danger before police officers are entitled to conduct a "pat-down." Thus, where the intrusion is greater than an order to exit the car, the Court requires commensurately greater justification. Accordingly, in the case before us, we conclude that we may

not rely on a generalized risk to officer safety to justify a routine "pat-down" of all passengers as a matter of course.* Because a frisk or "pat down" is substantially more intrusive than an order to exit a vehicle or to open its doors, we conclude that an officer must have justification for a frisk or a "pat-down" beyond the mere justification for the traffic stop.

The holdings in *Terry* and *Long* permitted frisks only when the officer perceived an appropriate level of suspicion of criminal activity and apprehension of danger, and we conclude that such a showing is necessary here. That showing, however, may be satisfied by an officer's objectively reasonable suspicion that drugs are present in a vehicle that he lawfully stops. Moreover, when drugs are suspected in a vehicle and the suspicion is not readily attributable to any particular person in the vehicle, it is reasonable to conclude that all occupants of the vehicle are suspect. They are in the restricted space of the vehicle presumably by choice and presumably on a common mission. Furthermore, as we have previously noted, guns often accompany drugs. *See Stanfield,* 109 F.3d at 984; *United States v. Perrin,* 45 F.3d 869, 873 (4th Cir.1995) (noting that "it is certainly reasonable for an officer to believe that a person engaged in selling of crack cocaine may be carrying a weapon for protection"). In the absence of ameliorating factors, the risk of danger to an officer from any occupant of a vehicle he has stopped, when the presence of drugs is reasonably suspected but probable cause for arrest does not exist, is readily apparent.

■ Accordingly, we hold that in connection with a lawful traffic stop of an automobile, when the officer has a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others.

■ In the case before us, Officer Ferstl had a reasonable suspicion, based on several hundred cases in which a Phillies Blunt cigar box was associated with marijuana, that drugs were present in the vehicle he stopped, and he could not attribute the suspected drugs solely to the driver because the Phillies Blunt cigar box was in the glove box. The indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer.

Moreover, the other factors that Officer Ferstl encountered did not allay his suspicion and apprehension but heightened them. After Officer Ferstl stopped the vehicle, neither Sakyi nor the driver could present any identification, and the driver lied twice about the status of his license. The stop occurred in the high crime area near where Washington Street intersects with the George Washington Parkway, across from two of the most common places along the parkway for violations involving drugs and guns. And finally, when Officer Ferstl asked Sakyi to exit the vehicle, he could not readily tell whether Sakyi was armed because Sakyi wore loose clothing. While the presence of Lt. Stover as a backup might arguably indicate a reduced safety risk to both officers, a substantial risk of danger would nevertheless remain from the possibility that Sakyi could have a gun and be able to use it while Officer Ferstl was in the vehicle conducting the search and Lt. Stover was directing his attention to Gunn, who was sitting in the police cruiser, or elsewhere.

■ Officer Ferstl conceded that Sakyi's *conduct* was not suspicious. But Officer Ferstl is not required to limit his assessment of the circumstances solely to those arising from the conduct of the passenger. A passenger's conduct may be sufficient to arouse

---

* We note that the Supreme Court recently granted the petition for certiorari in *Houghton v. Wyoming,* 956 P.2d 363 (Wyo.1998), *cert. granted,* —— U.S. ——, 119 S.Ct. 31, 141 L.Ed2d 791 (1998), in which the Wyoming Supreme Court held that police officers cannot lawfully search a passenger's purse left in the vehicle during a routine traffic stop when only the driver was suspected of illegal activity. An affirmance of that holding would not implicate this case because we are faced with merely a limited pat-down of the outer clothing and because we conclude that even the limited pat-down must be justified by a reasonable articulable suspicion of criminal activity and a legitimate concern for officer safety.

reasonable suspicion, *see United States v. Raymond,* 152 F.3d 309 (4th Cir.1998) (No. 96–4694) (holding that a passenger's awkward exit from the vehicle while clutching his stomach justified a "pat-down"), but it is not necessary when other factors are present. Here Officer Ferstl was entitled to conclude that Sakyi was voluntarily in the vehicle and that Sakyi and the driver were proceeding on a common course with a common purpose. He could conclude that the presence of the Phillies Blunt cigar box cast suspicion not only on the driver, but also on Sakyi. And finally, perhaps most importantly, he could conclude that "where there are drugs, there are almost always guns." *Stanfield,* 109 F.3d at 984. In these circumstances Officer Ferstl had not only a reasonable, articulable suspicion that illegal drugs were in the vehicle and that all of its passengers were tainted by that suspicion, but also a legitimate apprehension of danger to himself in conducting a search of the vehicle without first patting Sakyi down.

We believe that this real risk to the safety of Officer Ferstl outweighed the incremental intrusion of a brief outer-cloth "pat-down" which took but a few seconds. Sakyi was necessarily stopped when the driver was lawfully stopped, and the period of delay thus imposed was justified by the reason for stopping the driver.

In the objectively suspicious circumstances presented to Officer Ferstl, we conclude that he lawfully frisked Sakyi for the presence of weapons before searching the lawfully stopped vehicle. The judgment of the district court is

*AFFIRMED.*