**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 05-5051**

_____

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

        versus

RIDER ORIACH,

                                        Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.   Claude M. Hilton, Senior
District Judge.   (CR-99-451-CMH)

_____

Argued:  December 1, 2006          Decided:  March 14, 2007

_____

Before MOTZ and TRAXLER, Circuit Judges, and David A. FABER, Chief
United States District Judge for the Southern District of West
Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Matthew Alan Wartel, Alexandria, Virginia, for Appellant.
John Anthony Nowacki, Special Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for
Appellee.  **ON BRIEF:** Chuck Rosenberg, United States Attorney,
Lawrence J. Leiser, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Defendant Rider Oriach was convicted by a jury of conspiracy to distribute 500 grams or more but less than five kilograms of cocaine, in violation of 21 U.S.C.A. § 846 (West 1999). The district court sentenced Oriach to 63 months imprisonment. Oriach now appeals, contending that the district court erred in admitting three photographs taken by police officers during the course of their investigation and in denying his motion to suppress a large amount of cash seized from him during a traffic stop. For the following reasons, we affirm.

I.

In February 1996, United States Park Police Detective Eddie Ramos, Jr., working in an undercover capacity as a member of a Drug Enforcement Agency ("DEA") task force, initiated an investigation of a suspected cocaine and crack distribution operation headed by Franklin Tejada. In connection with the investigation, the task force applied for and received authorization for a wiretap on Tejada's home telephone in Fairfax, Virginia, and began surveillance of Tejada's apartment.

During the course of the investigation, Oriach and Jose Fuertes traveled from New York to Virginia on at least four occasions to sell powder cocaine to Tejada. Tejada, in turn, sold the drugs to various customers including, on at least one occasion,

Detective Ramos in an undercover buy. According to Tejada, who testified at Oriach's trial, Fuertes and Oriach traveled to his apartment and sold him 1.5 or 2 kilograms of cocaine on February 27, 1996, 1 or 1.7 kilograms of cocaine on March 1, 1996, 1 or 2 kilograms of cocaine on March 8, 1996, and 1 or 2 kilograms of cocaine on March 17, 1996. Ronnie Campbell and Richard Hollifield, who were also customers of Tejada and purchased cocaine directly from Fuertes and Oriach on at least one occasion, also confirmed Oriach's involvement in the cocaine distribution network.

In addition to the testimony of Oriach's customers, the government introduced wiretap conversations documenting Tejada's arrangements to purchase and sell cocaine, three surveillance photographs depicting Fuertes, Oriach, and their vehicle in the vicinity of Tejada's residence taken by police officers on March 1, 1996, and evidence of a large sum of cash seized from Fuertes and Oriach during a traffic stop on March 17, 1996.

II.

We begin with Oriach's challenge to the district court's admission of three photographs depicting Fuertes, Oriach and the vehicle they were traveling in on March 1, 1996. Oriach argues that the photographs should not have been admitted because they were not properly authenticated under Rule 901(a) of the Federal Rules of Evidence.

We review the district court's decision to admit evidence at trial for abuse of discretion. See United States v. Jones, 356 F.3d 529, 535 (4th Cir. 2004). Such rulings are also "subject to harmless error review." United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997). "In order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Id. (internal quotation marks and alteration omitted).

Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). By way of example, authentication can be satisfied by "[t]estimony of a witness with knowledge . . . that a matter is what it is claimed to be," Fed. R. Evid. 901(b)(1), or by "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result," Fed. R. Evid. 901(b)(9). The requirement that evidence be authenticated "represents a special aspect of relevancy, in that evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims." United States v. Branch, 970 F.2d 1368, 1370 (4th Cir. 1992) (internal citation, quotation marks, and alteration

4

omitted). "Questions of authentication take many forms." United States v. Patterson, 277 F.3d 709, 713 (4th Cir. 2002). However, "[t]he necessary foundation for the introduction of a photograph is most commonly established through eyewitness testimony that the picture accurately depicts the scene in question or expert testimony that the picture was generated by a reliable imaging process." Id.

At trial, Tejada testified that he purchased 1 or 2 kilograms of cocaine from Fuertes and Oriach on March 1, 1996. Aware of the impending deal, the DEA task force placed a surveillance team in the vicinity of Tejada's apartment to videotape the suspected drug dealers when they arrived. The challenged evidence consists of three still photographs that were lifted from the videotape, depicting Oriach, Fuertes, and a black Toyota Supra in which they were traveling, at Tejada's apartment. The photographs were admitted into evidence through the testimony of Detective Ramos, over Oriach's objection. Detective Ramos testified that, although he was not present at the scene when the surveillance team shot the video, he reviewed the evidence immediately after it was returned to the station and was aware that it had been taken at Tejada's residence on that date at approximately 3:00 p.m. Detective Ramos also testified that the date-stamp on the videotape, which specified the video recorder's default date of January 1, 1990, was

5

inaccurate because the task force agent videotaping the scene either did not realize he had to set it or accidentally reset it.

Oriach contends that the district court abused its discretion in allowing Detective Ramos to authenticate the photographs because Detective Ramos was not an eyewitness to the taping, had no first hand knowledge of the date or time of the photographs, and could not testify that the photographs were generated by a reliable imaging process. The government argues that Ramos's involvement in the investigation as a member of the DEA/Park Police task force, coupled with the testimony that he immediately reviewed the videotape when it was returned to the office that day, was a sufficient basis from which the jury could reasonably find that the challenged evidence was authentic.

We agree that Detective Ramos's knowledge, by virtue of his involvement in the investigation, was sufficient to authenticate the photographs insofar as they could be said to depict the location under surveillance, as well as the persons and vehicle under surveillance by the team. Detective Ramos could also verify that, as a result of the wiretap activities, the task force was aware of an impending deal and dispatched members to videotape the exterior of the residence on that date. Detective Ramos was unable, however, to testify from personal knowledge that the photographs were actually taken at the specified date and time. Detective Ramos admitted that he was not present on the scene at

the time the videotaping occurred, and the videotape itself contained an inaccurate date stamp. Thus, Detective Ramos had no first-hand knowledge of the date and time of the photographs, only the hearsay statements of the surveillance team members upon their return to the station, and no other reliable, circumstantial evidence that the video was taken at that time and on that date.

However, while we agree that the district court erred in admitting the photographic exhibits as having been taken on the specified date and time without proper authentication, the error was harmless. Detective Ramos's testimony identifying the alleged date of the photographs was cumulative to Tejada's testimony that he purchased cocaine from Oriach and Fuertes at his residence on March 1, 1996, and the specific time of the purchase was not material to the charge. It is also clear, based upon the jury's verdict, that the jury credited Tejada's testimony regarding this transaction with Fuertes and Oriach, as well as the additional three transactions discussed above. In sum, given the substantial evidence supporting Oriach's conviction and the cumulative nature of the photographic evidence, we are satisfied that the admission of the photographs was harmless error.

7

III.

Oriach next contends that the district court erred in denying his motion to suppress evidence of the large sum of cash seized by Officer Matias from Oriach during a March 17, 1996 traffic stop.

In addition to the prior three transactions mentioned above, Tejada testified that Fuertes and Oriach delivered 1 or 2 kilograms of cocaine to him at his residence on March 17, 1996, and that he paid the men $14,000 for this particular delivery. At approximately 10:30 p.m., Detective Ramos notified U.S. Park Police Officer Raul Matias to be on the lookout for two Hispanic males in a black Toyota Supra with Virginia license plates. Detective Ramos advised Officer Matias that the men had been involved in a narcotics transaction and would likely be traveling through his patrol area. As anticipated, Officer Matias spotted the vehicle shortly thereafter and followed it for approximately a mile. After clocking the vehicle's speed at 48 mph in a 35 mph zone, Officer Matias activated his emergency lights and siren. The vehicle pulled to the right-hand side of the road.

Immediately after stopping the vehicle, Fuertes, who was driving the vehicle, extended his hands out of the driver's side window and displayed his keys in one hand. Officer Matias, who had never seen this behavior before, thought it "extremely unusual" and "very suspicious." J.A. 155. After calling for backup assistance, Officer Matias approached the vehicle and asked the driver for his

8

license and registration and explained the reason for the stop. Fuertes provided Officer Matias with the requested documentation, although it was in the false name of Henry Alberto Perez.

At that point, Fuertes began to gratuitously "explain[] to [Officer Matias] that his brother was a police officer in New York and that a police officer had been shot in the previous two days, and that's why he pulled his hands out of the car." J.A. 156. After a brief exchange about where the men were coming from and going, Officer Matias returned to his patrol car. While waiting for backup units, Officer Matias wrote a warning ticket for speeding in Perez's name. He then returned to the vehicle to give Fuertes the ticket and advised Fuertes that he was free to leave.

Fuertes, however, chose not to leave, opting instead to again engage Officer Matias in a conversation about the recent murder of a New York police officer. Officer Matias then asked Fuertes if there were any weapons in his vehicle. Fuertes responded that there were not and told Officer Matias that he was "welcome to check the whole car if [he] want[ed]." J.A. 157. Officer Matias "took him up on the offer," asked both men to step out of the vehicle, and conducted a patdown search of their clothing. Id. During the patdown of Oriach, Officer Matias felt a bulge in Oriach's pocket and pulled out $5369 in cash in small bills. An additional $8,615 was found on Fuertes. Suspecting that the money was the fruit of the suspected illegal narcotics activity, Officer

9

Matias called for a canine unit to search the vehicle for drugs and separated the men to interview them.

Although no drugs were found in the vehicle, the men gave inconsistent answers as to how they knew one another and for how long, and they continued to act in a nervous and suspicious manner. Fuertes told Officer Matias that he had known Oriach for approximately one year, and that they were car dealers who had traveled from New York to Virginia to purchase a car. Oriach initially avoided Officer Matias's questions and acted confused and evasive, and Fuertes attempted to tell Oriach, in Spanish, to tell Officer Matias that they had known one another for one year. Officer Matias, however, understood Spanish. Eventually, Oriach told Officer Matias that he had known Fuertes for five years, since high school. Oriach then changed his story and told Officer Matias that he knew Fuertes through his uncle "Juan," but was then unable or unwilling to provide Juan's last name or any other identifying information.

After his indictment for conspiracy, Oriach filed a motion to suppress the $5369 in cash seized from him on March 17, 1996. Oriach alleged that his Fourth Amendment right to be free from unreasonable searches and seizures was violated when Officer Matias patted him down prior to searching the vehicle. We disagree.

Because "every traffic stop poses a meaningful level of risk to the safety of police officers," United States v. Sakyi, 160 F.3d

10

164, 168 (4th Cir. 1998), police officers making a lawful traffic stop may order the driver and passengers to step out of the vehicle as a matter of course, see Maryland v. Wilson, 519 U.S. 408, 410 (1997).  Police officers may also patdown or frisk the occupants of the vehicle "without a warrant if, under the totality of the circumstances, the officer has an articulable, reasonable suspicion that a person is involved in criminal activity and that he is armed."  United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998).  "The reasonableness of the search is measured objectively. If a reasonably prudent person would believe that his safety, or the safety of others, is endangered, he may conduct a limited search of outer clothing to discover any weapons."  Id.

Here, it is undisputed that Officer Matias's initial stop of the Toyota Supra for speeding was lawful and that Fuertes, after he was told he was free to leave, instead consented to and in fact invited Officer Matias to search the vehicle in which he and Oriach were traveling.  The issue on appeal is whether, under the totality of the circumstances, Officers Matias's decision to frisk or patdown Oriach prior to conducting the vehicle search ran afoul of Oriach's Fourth Amendment rights.  We conclude that it did not.

At the time of the traffic stop and subsequent patdown, the Park Police and the DEA were conducting a joint task force investigation of suspected drug dealer Tejada, which included a court-authorized wiretap of Tejada's telephone as well as on-site

11

surveillance of Tejada's residence. Officer Matias was specifically advised by Detective Ramos that two Hispanic men traveling in a Toyota Supra with a Virginia license plate were suspected of having been involved in a narcotics transaction and was told to be on the lookout for a vehicle meeting that description. Upon stopping the vehicle, Officer Matias observed specific, articulable behavior on the part of Fuertes, including Fuertes's act of sticking his hands out of the window without being prompted to do so and gratuitously bringing up a police officer shooting within the last two days, which Officer Matias understandably viewed as suspicious. When Officer Matias advised the men that they were free to leave, Fuertes chose not to do so and again engaged in suspicious and nervous behavior by bringing up the police officer shooting and inviting Officer Matias to enter the vehicle and search it.

Given the totality of the circumstances, including the unfortunate reality that "guns often accompany drugs," Sakyi, 160 F.3d at 169, we think Officer Matias's decision to conduct a patdown search of the vehicle occupants for weapons prior to placing himself in the vulnerable positions inherent in searching the vehicle of suspected drug dealers during nighttime hours was an imminently reasonable one. Because Officer Matias "had an objectively reasonable suspicion" that illegal drugs were in the vehicle and "a legitimate concern about his own safety," we hold

12

that "he acted lawfully under the Fourth Amendment in 'patting down' the passenger." id. at 165. Accordingly, Oriach is not entitled to relief on his Fourth Amendment claim.

IV.

For the foregoing reasons, we affirm Oriach's conviction and sentence.

AFFIRMED