COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Clements and Elder
Argued by teleconference


TYRONE JUNIOR McCAIN

MEMORANDUM OPINION[*] BY

v.        Record No. 0110-06-3                    JUDGE LARRY G. ELDER
                                                  MAY 8, 2007
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge

Joseph H. M. Schenk, Jr. (Office of the Public Defender, on brief),
for appellant.

Karen Misbach, Assistant Attorney General (Robert F. McDonnell,
Attorney General, on brief), for appellee.


Tyrone Junior McCain (appellant) appeals from his bench trial convictions for possession of

cocaine with intent to distribute, possession of a firearm while possessing cocaine with intent to

distribute, possession of a firearm after having been convicted of a felony, and carrying a concealed

weapon.  McCain contends that the police seized evidence from him in violation of the Fourth

Amendment and that the trial judge erred in denying his motion to suppress the evidence.  For the

following reasons, we affirm the convictions.

I.

The evidence proved that, shortly before 3:00 a.m. on August 9, 2005, Officer R.V.

Worsham was in a "high crime, high drug" area of Danville in which he had worked for almost

five years.  The area was "known for the drugs, known for shots fired, being called [in] all the

time[,] . . . probably at least once a night shift."  Officer Worsham saw a car, with its lights on,

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

parked in front of a particular house. As Officer Worsham watched, two people exited the car, "walked up to" the residence, and returned to their car in "under a minute." Officer Worsham was familiar with the residence, as he had been involved in a transaction a few months earlier in which an informant had made a controlled purchase of cocaine from the residence, and he described it as "a house known for selling drugs." When the car began to leave, Officer Worsham entered his vehicle, intending to follow. He noticed the plastic border around the car's rear license plate obscured the plate's expiration date and decided to stop the vehicle for that reason, but "before he could get it to stop for that, it was backing out into North Main Street," and he initiated a traffic stop for that offense. The location of the stop was "within sight distance" of the house at which he had first seen the vehicle.

Officer Worsham went to the car and asked the driver for her license. The front seat passenger identified himself to Worsham as Tyrone McCain, but Officer Worsham "already knew" the passenger was McCain. After learning from his dispatcher that the driver's license was "suspended," Officer Worsham requested assistance from another officer. Officer Worsham also asked appellant if he had a valid license "so that [appellant could . . . drive the vehicle without [it] being towed." Appellant informed the officer that he, too, had a suspended license. Officer Worsham then determined to inventory the car and have it towed, and he waited for assistance.

When Officer E.K. Thompson arrived, Officer Worsham stood with him behind the car. Worsham described to Thompson "what [he] had seen and what was going on and who was in the vehicle." Worsham told Thompson that "he observed this vehicle just leave a house that was known for selling drugs," that he was about to conduct a consent search of the vehicle, and that he wanted Thompson to "watch the passenger side while [he] got the driver out" because the

passenger, appellant, seemed "nervous" and "a little edgy" during Worsham's encounter with him that night.

Officer Worsham had the driver exit the car and obtained her consent to search both her person and the car. Officer Thompson talked to appellant while Officer Worsham removed the driver from the car. After Officer Worsham "checked [the driver]," he had her walk over and stand on the sidewalk. Officer Thompson then asked appellant to exit the vehicle and put his hands on the top of the car. In Officer Worsham's "dealing with [appellant] before, he seemed nervous," and Officer Worsham "was thinking [appellant] was going to run, just the way he was acting," so he began "eas[ing] around the back of the car" to serve as Officer Thompson's "backup" "if [appellant] did run." When appellant complied with Officer Thompson's request to exit the vehicle and put his hands on the top of the car, Officer Thompson said, "You don't mind if I pat you down, you got any weapons or drugs," and appellant was "kind of . . . apprehensive about it." Officer Thompson said appellant somehow expressed his desire that "he didn't want me to do that," but Officer Thompson said he was going to pat appellant down "for [the officers'] safety."

When Officer Thompson began patting appellant's left side, appellant's hands moved off the car. Officer Thompson "grabbed [appellant] by the arm and put him back on the car." He warned appellant, "[l]ook, don't be coming off the car like that cause I take that as a sign of aggression towards me." As Officer Thompson resumed the frisk, he felt what he believed to be "something hard, solid, . . . metallic" in appellant's left pocket. He reached into the pocket, retrieved some keys, and again asked appellant if he had any weapons. Appellant responded that he had a gun. After Officer Thompson found the handgun under appellant's shirt at his waistline, the officers arrested appellant and, during a search incident to arrest, discovered cocaine on appellant's person.

At the hearing on appellant's motion to suppress, the trial judge ruled appellant was not "free to leave when he was obviously the subject of a pat down." The judge concluded "Officer Thompson had a right to pat down the defendant" based on his "[awareness] of a controlled drug purchase" at the residence appellant visited, "the time of . . . morning, the characterization of the area as a high crime area, Officer Worsham's description of [appellant] whom he apparently knew or at least . . . had prior contact with him and described [appellant] as being nervous."

## II.

On appeal of a ruling on a motion to suppress, we view the evidence in the light most favorable to the prevailing party, here the Commonwealth, granting to the evidence all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc). However, we review *de novo* the trial court's application of defined legal standards, such as whether the police had reasonable suspicion or probable cause for a search or seizure. Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663, 134 L. Ed. 2d 911 (1996).

Our review of the existence of probable cause or reasonable suspicion involves application of an objective rather than subjective standard. See, e.g., Whren v. United States, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996). In ordinary Fourth Amendment analysis, the fact "'that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as [all] the circumstances, viewed objectively, justify that

- 4 -

action.'"[1]  Id. at 813, 116 S. Ct. at 1774 (quoting Scott v. United States, 436 U.S. 128, 138, 98 S. Ct. 1717, 1723, 56 L. Ed. 2d 168 (1978)).

An officer may effect a Terry stop, i.e., a "brief, minimally intrusive investigatory detention[]," Wechsler v. Commonwealth, 20 Va. App. 162, 169, 455 S.E.2d 744, 747 (1995) (citing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)), if he "observes unusual conduct which leads him reasonably to believe in light of his experience that criminal activity may be afoot" and that the person or persons he detains are involved in it, Terry, 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911.  An officer who develops reasonable suspicion that criminal activity is occurring may stop a person "in order to identify him, to question him briefly, or to detain him briefly, while attempting to obtain additional information" in order to confirm or dispel his suspicions.  Hayes v. Florida, 470 U.S. 811, 816, 105 S. Ct. 1643, 1647, 84 L. Ed. 2d 705 (1985).

An officer may effect a traffic stop when he has probable cause to believe a traffic or equipment violation has occurred.  Dickerson v. Commonwealth, 35 Va. App. 172, 177, 543 S.E.2d 623, 626 (2001).  During the course of the stop, he may take certain steps to protect himself, such as asking the driver and any passengers to exit the vehicle.  Maryland v. Wilson, 519 U.S. 408, 414-15, 117 S. Ct. 882, 886, 137 L. Ed. 2d 41 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6, 98 S. Ct. 330, 333 n.6, 54 L. Ed. 2d 331 (1977).  "[P]olice officers may also detain passengers beside an automobile until the completion of a lawful traffic stop."  Harris v. Commonwealth, 27 Va. App. 554, 562, 500 S.E.2d 257, 261 (1998) (citing Hatcher v. Commonwealth, 14 Va. App. 487, 491-92, 419 S.E.2d 256, 269 (1992)).

---

[1] Thus, as long as the evidence supports the trial court's finding that the officers had reasonable suspicion or probable cause to detain appellant, we need not consider the testimony of the officers that appellant may have been free to leave during some or all portions of their encounter with him.

An officer may not automatically search a driver or his passengers pursuant to issuance of a traffic citation or in the course of a Terry stop, but he may frisk the driver and passengers for weapons if he develops reasonable suspicion during the traffic or Terry stop to believe the particular person frisked is armed and dangerous. Knowles v. Iowa, 525 U.S. 113, 117-18, 119 S. Ct. 484, 488, 142 L. Ed. 2d 492 (1998); Adams v. Williams, 407 U.S. 143, 146, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612 (1972); Phillips v. Commonwealth, 17 Va. App. 27, 30, 434 S.E.2d 918, 920 (1993); see Wayne R. LaFave, Search and Seizure § 9.5(a), at 246-47 (3d ed. 1996) (noting officer may conduct weapons frisk if he (1) is rightly in presence of party frisked, such as to conduct investigatory stop or to arrest some other person, and (2) has reasonable suspicion that person may be armed and dangerous). Circumstances "relevant in [this] analysis include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." Christian v. Commonwealth, 33 Va. App. 704, 714, 536 S.E.2d 477, 482 (2000) (en banc). Nervousness during the course of a traffic stop, standing alone, is insufficient to justify a frisk for weapons, Moore v. Commonwealth, 12 Va. App. 404, 406-07, 404 S.E.2d 77, 78 (1991), but "nervous, evasive behavior is a pertinent factor" for consideration in assessing the totality of the circumstances, Illinois v. Wardlow, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000).

Here, the evidence proved that Officer Worsham had probable cause to stop the vehicle in which appellant was riding when he observed both an equipment violation and a traffic infraction. Based on Officer Worsham's legitimate stop of the vehicle, the Fourth Amendment permitted the officers to require appellant to exit the vehicle and to detain him for a reasonable period of time to ensure their safety while completing the traffic stop. The information gleaned by the officers both before and during the traffic stop gave them reasonable suspicion to believe

- 6 -

appellant was armed and dangerous and to frisk him for weapons in order to ensure their safety. The officers' encounter with appellant and the driver of the vehicle occurred shortly before 3:00 a.m. in a "high crime, high drug[]" area in which the police received nightly reports of shots being fired. Officer Worsham first noticed the car in which appellant was a passenger when it pulled up in front of "a house known for selling drugs" and from which Officer Worsham, via an informant, had made a controlled purchase of cocaine only a few months earlier. Officer Worsham then observed appellant and the vehicle's driver get out and go up to the residence, returning to the car less than a minute later and driving off. When Officer Worsham stopped the vehicle at a location within view of the house, he observed that appellant, whom he "already knew" from a previous encounter or encounters, was nervous. Officer Worsham relayed all this information to Officer Thompson, who served as Worsham's backup officer. Thus, when Officer Thompson frisked appellant for weapons and appellant admitted having a firearm in his waistband, Officer Thompson had reasonable suspicion to believe appellant had engaged in a drug transaction and was armed and dangerous. See Walker v. Commonwealth, 42 Va. App. 782, 791, 595 S.E.2d 30, 35 (2004) (holding appellant's strange behavior and "very nervous" appearance in area known for drug activity justified frisk); James v. Commonwealth, 22 Va. App. 740, 745-46, 473 S.E.2d 90, 92 (1996) (holding passenger's "jittery" behavior while officers arrested driver on felony warrant and passenger's unresponsiveness to requests to keep hands in view supported frisk); see also Jones v. Commonwealth, 272 Va. 692, 701 n.3, 636 S.E.2d 403, 407 n.3 (2006) (noting "it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction").

## III.

We hold that, in view of the totality of the circumstances, the officers were justified in detaining appellant during the lawful traffic stop and had reasonable suspicion to believe he was

armed and dangerous.  For these reasons, we hold the trial judge did not err in denying the

motion to suppress, and we affirm the convictions.

Affirmed.

Benton, J., dissenting.

The United States Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968), guides our analysis of the validity of a frisk for weapons. The Court held as follows:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

Id. at 30. In other words, Terry created a "narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer." Id. at 27. See United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (noting that the holding in Terry "permitted frisks only when the officer perceived an appropriate level of suspicion of criminal activity and apprehension of danger").

The Supreme Court has held that an officer's authority to order an occupant from a vehicle during a traffic stop is justified by the potential risks associated with traffic investigation and implicates safety concerns. Maryland v. Wilson, 519 U.S. 408, 413-14 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 110-11 (1977).

> Only Mimms and Wilson, however, rely on this generalized risk to justify police action, finding it sufficient justification to order occupants to exit a lawfully stopped vehicle. By contrast, Terry and [Michigan v. Long, 463 U.S. 1032 (1983),] require a specific, articulable suspicion of danger before police officers are entitled to conduct a "pat-down." Thus, where the intrusion is greater than an order to exit the car, the Court requires commensurately greater justification. Accordingly, . . . we may not rely on a generalized risk to officer safety to justify a routine "pat-down" of all passengers as a matter of course. Because a frisk or "pat down" is substantially more intrusive than an order to exit a vehicle or to open its doors, we conclude that an officer must have justification

for a frisk or a "pat-down" beyond the mere justification for the traffic stop.

Sakyi, 160 F.3d at 168-69 (footnote omitted).

To establish reasonable suspicion "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (quoting Terry, 392 U.S. at 27). Significantly, neither Officer Worsham nor Officer Thompson articulated a suspicion Tyrone McCain had engaged in a drug transaction or in other criminal conduct. Indeed, Officer Worsham testified they had no reason to detain McCain.

> Q. Do you agree with me there was no reason to detain Mr. McCain, correct?
>
> A. What do you want me to agree to?
>
> Q. There was no reason for you to detain Mr. McCain . . . that's what you agreed to in the General District Court . . . I'm . . .
>
> A. In the vehicle or after he was . . . when he got out?
>
> Q. When he got out of the vehicle?
>
> A. We weren't holding him for nothing.
>
> Q. He was free to leave, correct?
>
> A. He could have been.
>
> Q. Because he hadn't been doing anything illegal . . . you were towing the vehicle and searching the vehicle, correct?
>
> A. Right.
>
> *   *   *   *   *   *   *
>
> Q. And your testimony is still that he was free to leave at any time?
>
> A. He wasn't under arrest.

This testimony is consistent with Officer Worsham's testimony that when he earlier learned the driver's license was "suspended," he "asked [McCain] if he had a license so that he could, you know, somebody could drive the vehicle without being towed."

Officer Thompson likewise testified McCain was not under arrest and was free to leave. He explained the frisk for weapons as follows:

> Q. Let me ask you this, Officer Thompson, you go into that neighborhood frequently, correct?
>
> A. That is actually my beat, yes sir.
>
> Q. All right. And when you enter that neighborhood do you frequently search people who are normally not under arrest and free to go about their business?
>
> A. When I am interacting with people, yes sir.
>
> Q. So, if you just were to walk in that neighborhood and you said hi to someone, would you pat them down as well?
>
> A. Yes sir.
>
> Q. Even if they said, no, they don't want you to pat them down?
>
> A. If I'm getting out for a reason to talk to somebody I would definitely pat them down for my safety.
>
> Q. You were aware that Mr. McCain was not under arrest, correct?
>
> A. That is correct.
>
> Q. And you would agree that he was free to leave at any time, correct?
>
> A. That is correct.
>
> Q. But the video clearly shows him getting out under your direction?
>
> A. Uh-hum.
>
> Q. And placing his hands up onto the top of the car, correct . . . he told you that he did not want to be searched, correct?

A. That is correct, you know, in the round about way, I believe that's how it was.

In response to a question from the trial judge, Officer Thompson agreed that once he began the frisk, McCain was not free to leave.[2]

The testimony of both officers established that the frisk was improperly based upon a generalized safety risk and was part of the officers' routine procedure. See Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979); Sakyi, 160 F.3d at 169. Even if we were to overlook this express testimony, the circumstances of this case do not support a reasonable suspicion McCain was engaged in criminal activity. A court must consider the totality of the circumstances—"the whole picture"—to determine whether an officer had a particularized and objective basis for suspecting an individual of involvement in criminal activity. United States v. Cortez, 449 U.S. 411, 417 (1981); Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000). Here, the circumstances establish that at the onset of these events McCain was a passenger in a vehicle stopped for a relatively minor traffic infraction. The officers detained him solely because of the actions of the driver and, significantly, both officers testified that McCain was "free to leave." They articulated no reasonable suspicion of criminal activity implicating McCain, and their testimony established that in the course of the stop no circumstances developed a reasonable suspicion of criminal activity prior to the frisk.

---

[2] The trial judge ruled "the Court does not accept that [McCain] was free to leave when he was obviously the subject of a pat down." The judge's ruling was based, however, on the fact of the frisk and the testimony of Officer Thompson, affirming that "at least during the course of the pat down, the defendant was not free to leave." Furthermore, this finding must be considered in the light of Officer Worsham's testimony that when he stopped the car, he was detaining the driver and was not "holding [McCain] for nothing." Officer Worsham also testified that, when he learned the driver's license was "suspended," he "asked [McCain] if he had a license so that he could, you know, somebody could drive the vehicle without being towed." These circumstances existed even though the officers knew McCain had been in the house.

- 12 -

Although the character of the location and the time are relevant factors, they do "not supply 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Riley v. Commonwealth, 13 Va. App. 494, 498, 412 S.E.2d 724, 727 (1992) (quoting Cortez, 449 U.S. at 417-18). See Brown v. Texas, 443 U.S. 47, 51 (1979) (holding appellant's presence in a neighborhood frequented by drug dealers, standing alone, insufficient basis for suspicion of criminal activity); see also People v. Medina, 1 Cal. Rptr. 3d 546, 550 (Cal. Ct. App. 2003) (holding detention and search unlawful where based solely on appellant's presence at night in a high crime area). Although Officer Worsham was aware of a controlled purchase of drugs at the house in this high drug area, that event occurred "months" before McCain entered the house. He did not qualify "months," leaving to speculation whether it was two or twenty-four months earlier. The record contains no indication drug activity continued at the house or that the house was occupied by the same persons who occupied it "months" ago. See e.g., People v. Lockhart, 724 N.E.2d 540, 542-43 (Ill. App. 2000) (noting that an officer's detention and frisk of a person who visited a house in a high-drug-traffic area for five minutes was based on the officer's knowledge of a prior drug arrest months ago at the house and holding that fact "was insufficient to provide him with specific, articulable suspicion to stop the defendant"); People v. Harper, 603 N.E.2d 115, 116-17 (Ill. App. 1992) (holding the facts failed to establish "an articulable suspicion that a crime had been committed" when an officer saw a man enter a "known dope house" and remain for less than a minute, without any knowledge "of what defendant did after he entered the building").

McCain's brief presence at a house the officer associated with drug activity months prior does not support a reasonable inference of criminal activity. Id.; Toliver v. Commonwealth, 23 Va. App. 34, 37, 473 S.E.2d 722, 724 (1996). The record contains no evidence concerning the purpose of McCain's visit. Moreover, neither officer testified he had personal knowledge or

information of McCain's involvement with drugs or weapons. Neither officer observed evidence of drugs or drug paraphernalia on McCain, on the driver, or inside the car. Significantly, neither officer testified McCain was engaged in drug-related activity or that his behavior was consistent with drug activity. The officers were simply acting on a hunch that McCain had an association with drugs because he went to the house. The United States Supreme Court rejected this type of hunch in Sibron v. New York, 392 U.S. 40 (1968), where the officer saw Sibron talking to a number of known narcotics addicts over a period of eight hours without any knowledge of their conversations and without seeing anything exchanged. Id. at 63. Reversing the denial of a motion to suppress, the Court held "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." Id. at 62.

Both officers testified McCain appeared "nervous" in their presence. Although "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," Wardlow, 528 U.S. at 124, "[n]ervousness is a common and entirely natural reaction to police presence" and therefore must be treated with caution. United States v. McKoy, 428 F.3d 38, 40 (5th Cir. 2005). To offer any substantial basis for reasonable suspicion of criminal activity, nervous appearance must be tied to significant additional factors. Id.; see also Moore v. Commonwealth, 12 Va. App. 404, 406-07, 404 S.E.2d 77, 78 (1991) (holding a frisk based on nervousness alone was unreasonable). Despite McCain's nervous demeanor he was forthright in identifying himself and answering questions. The officers did not testify about furtive behavior suggesting sinister or menacing conduct occurring before the frisk. In short, the officers' testimony about his behavior did not demonstrate the type of nervous, evasive conduct that warrants suspicion of criminal activity. For these reasons, I would hold the officers did not articulate a reasonable suspicion of criminal activity by McCain and the record did not establish it.

Further, I would hold the facts do not support a reasonable suspicion McCain was armed and dangerous. A frisk for weapons is justified only where an officer is obligated to investigate criminal behavior. See Terry, 392 U.S. at 32-33 (Harlan, J., concurring). It is not enough to justify a frisk for weapons that an officer merely articulate a safety concern based on circumstantial factors where the facts are insufficient to conduct an investigative detention of the person. Ybarra, 444 U.S. at 93-94. The Terry restrictions do not permit a "generalized policy of frisking all persons." Sattler v. Commonwealth, 20 Va. App. 366, 369, 457 S.E.2d 398, 400 (1995). In other words, "in the absence of reasonable suspicion, an officer may not frisk a citizen merely because he feels uneasy about his safety." United States v. Burton, 228 F.3d 524, 529 (4th Cir. 2000). Here, the record is devoid of evidence to support a reasonable suspicion McCain was an armed danger to the officers. The officers observed no bulges in his clothing, no furtive or sudden movements, and McCain was cooperative and compliant with police orders. The totality of the circumstances does not support a reasonable suspicion McCain was armed and dangerous.

In summary, the frisk was based on the officers' routine conduct and upon facts that support no more than a "hunch" of criminal activity relating to McCain. "In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." Brown, 443 U.S. at 52. I would hold, therefore, the officers lacked reasonable suspicion to believe McCain was engaged in criminal activity or was armed and dangerous. Because the frisk violated the protections of the Fourth Amendment, I would hold the trial judge erred in denying the motion to suppress, and I would reverse the convictions and dismiss the indictments.